76 F.3d 1032
 96 Cal. Daily Op. Serv. 1006, 96 Daily Journal
D.A.R. 1678
Stephanie G. PIERCE, Plaintiff-Appellant,
v.
MULTNOMAH COUNTY, OREGON; City of Portland, Oregon;
Tri-County Metropolitan Transportation District of
Oregon; Steve Duncan; Janet Bowdle;
and, George Karcher,
Defendants-Appellees.
 No. 93-35405.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 2, 1994.
Decided Feb. 14, 1996.
 
 Stephanie G. Pierce, Pro Se, Portland, Oregon, for plaintiff-appellant.
 Gerald H. Itkin, Multnomah County Counsel, Portland, Oregon; Harry Auerbach, Deputy City Attorney, Portland, Oregon, for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon, George E. Juba, Magistrate Judge, Presiding.
 Before: FLETCHER, D.W. NELSON, and RYMER, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Pro se[1] plaintiff Stephanie Pierce appeals an adverse judgment following a jury trial in her 42 U.S.C. § 1983 action. Plaintiff sued the City of Portland ("City"), Multnomah County ("County"), the Tri-County Metropolitan Transportation District of Oregon ("Tri-Met"), fare inspector Jackson, corrections officers Bowdle and Karcher, and police officer Duncan, alleging that the defendants violated her Eighth and Fourth Amendment rights and also violated federal and state law. She was detained for four hours for identification following a citation for boarding a train without proof of payment of fare. The parties tried the case before a magistrate judge, who directed verdicts for the City, Bowdle, and Duncan. A jury returned a verdict for the defendants on the remaining claims. Upon denial of her motion for a new trial, Pierce timely appealed. We have jurisdiction, 28 U.S.C. § 1291, and reverse and remand.FACTS & PRIOR PROCEEDINGS
 
 
 2
 Fare inspector Jackson stopped Pierce as she was boarding a Tri-Met train and cited her for failing to produce proof of payment of fare. Pierce did not have any identification, so Jackson called the police to do an identification report. After police officer Duncan arrived, Pierce testified that she provided her name, date of birth, zip codes, addresses, and phone numbers--one for her residence and the other for her business--but refused to provide her social security number. Duncan radioed the police computer and was able to locate Pierce's name, a matching address, and her arrest record. When Duncan asked Pierce whether she had an arrest record, Pierce initially denied that she had ever been arrested. However, Pierce later confirmed his information that she had been arrested for shoplifting many years earlier. The radio check also included a Laidlaw residential address. Although Pierce did not have her driver's license with her, the police data base provided her driver's license number. The Laidlaw address and the Ankeny store address were both included on the completed citation.
 
 
 3
 Duncan ultimately charged Pierce with the misdemeanor of furnishing false information to a police officer, Or.Rev.Stat. § 162.385,[2] and with the failure to produce proof of payment of fare, Tri-Met Code § 29.15. She was handcuffed and searched. Pierce testified that Duncan performed these tasks in an excessively rough manner. Pierce was taken by police car to and led in hand-cuffs through the Meier & Frank Department Store where officer Duncan had gone in order to question a shoplifter in an unrelated incident. Pierce was then transported to the Multnomah County Detention Center for a "firm" identification. At the jail, Pierce was photographed, screened by a nurse, fingerprinted, searched, and detained in a cell.
 
 
 4
 Pierce testified that during the approximately four hours she spent at the jail, she was assaulted by corrections officers Karcher and Bowdle. According to Pierce, the officers forcibly yanked her arm behind her back, shouted at her, grabbed her hair, and forced her back into a cell after she was told she was free to go. The defendants admit that they administered "control holds," but claim that the force was necessary because Pierce was distraught, demanding, abusive, and uncooperative during her detention.
 
 
 5
 Pierce filed a section 1983 action. She stipulated to the dismissal of Tri-Met, and the remaining parties consented to trial before Magistrate Judge Juba. Pierce inadvertently dismissed her claim against the County. The magistrate judge denied her motion to reinstate the County as a defendant.
 
 
 6
 At trial, the City and Duncan stipulated that the charge for furnishing false information was not the basis for their authority to detain Pierce. Rather, the City and Duncan relied solely on the infraction of failure to furnish proof of payment of fare as the basis for the plaintiff's custodial detention.
 
 
 7
 At the close of plaintiff's case-in-chief, the magistrate judge directed verdicts for the City and Duncan. The magistrate judge also directed a verdict for Bowdle on Pierce's Fourth Amendment claim for forcibly seizing her after she was released. The magistrate judge instructed the jury on Eighth Amendment standards pertaining to excessive force. It returned a verdict for the defendants on Pierce's excessive force claims against Bowdle and Karcher. Judgment was entered for all defendants. After Pierce's motion for a new trial was denied by the district court, she timely appealed.
 
 DISCUSSION
 
 8
 I. Directed Verdict for City and Officer Duncan on Pierce's Fourth Amendment Claim
 
 
 9
 Pierce argues first that the trial court erred by directing a verdict for the City and Duncan on her claim that her Fourth Amendment rights were violated by the custodial detention for identification for the fare-beating infraction.[3] We agree.
 
 
 10
 We review de novo the grant of a directed verdict. Zamalloa v. Hart, 31 F.3d 911, 913 (9th Cir.1994); In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 816 (9th Cir.1992). "[A] directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict." McGonigle v. Combs, 968 F.2d 810, 816 (9th Cir.), cert. dismissed, 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). "If conflicting inferences may be drawn from the facts, the case must go to the jury." Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir.1986). Therefore, to uphold the directed verdict for Duncan and the City, we would have to determine that the evidence supported only a verdict in their favor.
 
 A. Duncan's Claim of Qualified Immunity
 
 11
 As to Duncan, the factual dispute concerns whether Duncan reasonably could have believed the identifying information supplied by Pierce was inadequate or that the fare infraction warranted detention. We conclude that because Pierce presented evidence from which the jury could conclude that any such beliefs were unreasonable, Duncan was not entitled to a directed verdict on his claim of qualified immunity. Accordingly, we reverse and remand for determination by the jury after both sides have introduced their evidence.
 
 
 12
 The doctrine of qualified immunity shields public officials performing discretionary functions under certain circumstances. See Harlow v. Fitzgerald, 457 U.S. 800, 812, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982). The availability of qualified immunity "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting Harlow, 457 U.S. at 818, 819, 102 S.Ct. at 2739); see generally Grossman v. City of Portland, 33 F.3d 1200, 1209-10 (9th Cir.1994) (ordinarily enforcement of an ordinance entitles officer to qualified immunity). However, qualified immunity is not available if, "in light of pre-existing law," the unlawfulness of the officer's conduct was "apparent." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. "[A]n officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance will not be entitled to immunity even if there is no clear case law declaring ... the officer's particular conduct unconstitutional." Grossman, 33 F.3d at 1209-10 (citing Chew v. Gates, 27 F.3d 1432, 1449-50 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995)).
 
 
 13
 Applying these principles to the case at hand, we conclude that disputes of fact preclude a directed verdict on Duncan's qualified immunity claim.
 
 1. Clearly Established Law
 
 14
 The threshold issue in determining whether an officer's conduct is objectively legally reasonable is whether the law regarding the right that the plaintiff claims has been violated was "clearly established" at the time of the alleged violation. Harlow, 457 U.S. at 819, 102 S.Ct. at 2739. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039. Thus, this standard demands that the right be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful. See id. (finding that "in the light of pre-existing law the unlawfulness must be apparent").
 
 
 15
 Pierce claims that her de facto arrest by Duncan violated clearly established law because Duncan lacked authority to arrest her for identification after he had sufficient information for the issuance of the citation for the fare infraction. We agree. The length and scope of detention must be justified by the circumstances authorizing its initiation. See Terry v. Ohio, 392 U.S. 1, 16, 19, 88 S.Ct. 1868, 1877, 1878, 20 L.Ed.2d 889 (1968). Thus, when an officer has obtained sufficient information to issue a citation, a continued detention without probable cause to arrest for a crime is unreasonable. United States v. Luckett, 484 F.2d 89, 90-91 (9th Cir.1973) (per curiam) (finding that an individual stopped for jay-walking may be detained "only the time necessary to obtain satisfactory identification from the violator and to execute a traffic citation"); see also McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir.1984) (holding that arrest requires "objective evidence which would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense"); United States v. Jennings, 468 F.2d 111, 115 (9th Cir.1972) (holding that, after an initial investigative inquiry on the street is completed, continued detention of an individual for fingerprinting and photographing is constitutionally invalid without probable cause to arrest).
 
 2. Objectively Reasonable Conduct
 
 16
 The critical question, then, is whether Duncan's conduct in seizing and searching Pierce, conduct in which he engaged because he allegedly was not fully satisfied with her responses to his questions at the site of the initial stop, was objectively reasonable. If "the actions [the plaintiff] allege(s) [the officer] to have taken are actions that a reasonable officer could have believed lawful, then the officer is entitled to dismissal prior to discovery." Anderson, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6. Further proceedings are necessary only if there is a material factual dispute concerning what actions the officer took and the officer's version of what took place. See Johnson v. Jones, --- U.S. ----, ---- - ----, 115 S.Ct. 2151, 2156-59, 132 L.Ed.2d 238 (1995); Anderson, 483 U.S. at 646, n. 6, 107 S.Ct. at 3042, n. 6; see also Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir.1993). "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden is on the defendant to establish the reasonableness of his or her actions. Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir.1995).
 
 
 17
 "In evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest." United States v. Mota, 982 F.2d 1384, 1388 (9th Cir.1993); see also Barry v. Fowler, 902 F.2d 770, 771 (9th Cir.1990) (finding that arrest without probable cause that the arrestee committed a crime constitutes a violation of the Fourth Amendment). Officer Duncan contends that he relied on his understanding that informal custodial detention for identification was authorized under Oregon law, pursuant to Or.Rev.Stat. § 153.110 and the City's acknowledged policy interpreting that statute, without any need to satisfy the requirement of probable cause to arrest for an offense punishable by incarceration. Thus, he claims that his conduct in arresting Pierce for identification comports with the Fourth Amendment's reasonableness requirement. See, e.g., Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir.1994) (finding that an officer who acts in reliance on a duly enacted ordinance usually is entitled to qualified immunity).
 
 
 18
 However, "an officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to immunity even if there is no clear case law declaring the ordinance or the officer's particular conduct unconstitutional." Grossman, 33 F.3d at 1209-10 (citing Chew v. Gates, 27 F.3d 1432, 1449-50 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995)). Thus, if Pierce is correct and she was identified adequately at the train stop to permit the issuance of the citation, Duncan's understanding of the statute and his actions in reliance thereon would not be objectively reasonable.
 
 
 19
 Duncan claims that Pierce's provision of her store address and her initial denial of any prior arrests cast sufficient doubt on her identity to permit him to detain her for firm identification at the jail facility. Pierce contends that she provided adequate information at the scene and that there was no basis for a further detention. Because the magistrate judge directed a verdict for Duncan at the close of the plaintiff's case-in-chief, the facts as to the sufficiency of Pierce's identification and justification for detention for a fare infraction were not fully resolved at trial. Because these foundational facts remain in dispute and could be decided in Pierce's favor by a jury, we conclude that Duncan is not entitled to qualified immunity on directed verdict. These facts must be determined by the jury before Duncan's qualified immunity claim can be resolved. For this reason, the magistrate judge erred by granting a directed verdict for Duncan on this issue.
 
 B. City's Liability
 
 20
 We next turn to whether the trial court erred by directing a verdict for the City. To prevail on her Section 1983 claim against the City, Pierce must show that the City adhered to a "policy, practice or custom" that caused her to be deprived of her constitutional rights. City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); see also Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir.1989). Pierce submitted evidence in support of her claim that the City had a policy of detaining persons who had committed offenses for which there is no statutory authority to arrest and delivering them to the County jail for "booking" in order to secure a firm identification. Pierce argues that this policy violated her Fourth Amendment right to be free from unreasonable searches and seizures.
 
 
 21
 To uphold the directed verdict for the City, we would have to conclude as a matter of law that the evidence introduced by Pierce in her case-in-chief allowed no other conclusion but that the City had no policy or practice of detaining persons for identification in violation of the Fourth Amendment, or that, if it had a policy or practice, the evidence allowed of no other conclusion than that the policy was not applied to Pierce in a way that violated her constitutional rights. See Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 705-06 (9th Cir.1989).
 
 
 22
 The City acknowledged that it had a custodial-detention-for-identification policy but argued that its standard procedures were authorized by law and were constitutional. At the pre-trial conference, counsel for the City conceded that the City had a policy or practice of detaining individuals for firm identification in situations such as this where a law enforcement officer had probable cause to issue a fare citation for a nonarrestable offense; in fact, the attorney for the City acknowledged that the policy requires that the individual be held in the facility for a mug shot even after there is an order to release for lack of probable cause for arrest. The City argued that there was no factual dispute regarding the policy, but merely a question of law regarding the constitutionality of detention for collection of identification records even when there is no probable cause for arrest.
 
 
 23
 Although these concessions of policy by the City were not presented as evidence to the jury and are therefore not considered in our directed verdict analysis, we conclude that Pierce presented sufficient evidence at trial that the City had a policy, practice, or custom of custodial detention for firm identification on nonarrestable offenses to withstand the directed verdict. City of Portland Police Officer Kane testified on cross-examination in plaintiff's case-in-chief that he understood that he had the authority under Oregon law to take an offender to the station to perform an identification check, even in a situation in which the underlying offense did not carry a jail sentence. Based on this, a jury could reasonably conclude that the City authorized such custodial detention for identification, i.e., that it had a policy of permitting such detention.[4] Kane's additional reference to other instances of officers taking suspects to the station for firm identification on nonarrestable offenses reasonably supports a finding of a City custom or practice of custodial detention for identification. Additionally, ID technician Pittock testified that he had seen instances of police officers bringing in citations that said "furnishing false information" without an accompanying underlying charge, as in the instant case. As the officers bringing in citations to the center included City police officers, it is reasonable to infer that there was a City custom or practice of custodial detention for identification even when there was no independently arrestable offense. Drawing all reasonable inferences in the light most favorable to Pierce, there was sufficient evidence of a City policy, practice or custom of custodial detention for firm identification on infractions. Thus, the magistrate judge erred in directing a verdict for the City of Portland on the basis that "there is no evidence of any custom or policy."
 
 
 24
 There was also sufficient evidence to conclude that the City's alleged policy is unconstitutional on its face to the extent that it allows arrests for nonarrestable offenses. The extent of the permitted invasions of the individual's Fourth Amendment rights depends on the gravity of the offense. The alleged constitutional violation at issue here stems from the Fourth Amendment's guarantee that government officials may not subject citizens to unreasonable searches or seizures without proper authorization. In this context, the Fourth Amendment requires that the length and scope of a detention be "strictly tied to and justified by the circumstances which rendered its initiation permissible." Terry v. Ohio, 392 U.S. 1, 16, 19, 88 S.Ct. 1868, 1877, 1878, 20 L.Ed.2d 889 (1968).
 
 
 25
 Although police need only a reasonable suspicion of criminal activity to conduct a brief investigatory detention, see, e.g., id. at 30, 88 S.Ct. at 1884, the Fourth Amendment demands that the seizure be supported by probable cause when that detention rises to the level of an arrest. See, e.g., Dunaway v. New York, 442 U.S. 200, 212-14, 99 S.Ct. 2248, 2256-58, 60 L.Ed.2d 824 (1979) (finding that "the treatment of petitioner, whether or not it is technically characterized as an arrest, must be supported by probable cause"); Brown v. Texas, 443 U.S. 47, 50-52, 99 S.Ct. 2637, 2640-41, 61 L.Ed.2d 357 (1979); cf. Kolender v. Lawson, 461 U.S. 352, 365, 103 S.Ct. 1855, 1862, 75 L.Ed.2d 903 (1983) (Brennan, J., concurring) ("Detention beyond the limits of Terry without probable cause would improve the effectiveness of legitimate police investigations by only a small margin, but it would expose individual members of the public to exponential increases in both the intrusiveness of the encounter and the risk that police officers would abuse their discretion for improper ends."). The Fourth Amendment's protections are not limited to traditional, full-fledged arrest, but apply whenever "police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." Hayes v. Florida, 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985).
 
 
 26
 The City argued that its blanket policy of allowing custody for firm identification was constitutional based on its interpretation of the statutory grant of authority to detain for identification for violations of infractions. See Or.Rev.Stat. § 153.110(3).[5] However, that statute expressly denies authority to arrest for infractions. Id.[6] In addition, Oregon courts have interpreted the statute as providing only a limited authority to stop and detain that is short of a full arrest. See, e.g., State v. Farley, 93 Or.App. 723, 764 P.2d 230, 231-32 n. 2 (1988) (stating that the legislature's purpose in passing the statute was to permit issuance of citations "without giving [officers] full powers of arrest and detention"), rev'd on other grounds, 308 Or. 91, 775 P.2d 835 (1989).
 
 
 27
 Even when offenses are involved for which police officers have explicit statutory authority to arrest, Oregon courts have held that police officers cannot lodge a person in jail under full custodial arrest unless they have other grounds apart from the minor traffic violation itself. See Easton v. Hurita, 290 Or. 689, 625 P.2d 1290, 1295 (1981) (interpreting Or.Rev.Stat. § 484.100(1), which provides that police officers may arrest a person for a traffic offense). This limitation is based on the "valid concern about police harassment of people charged with relatively innocuous traffic infractions" and the fact that a full custody arrest entails "be[ing] taken to jail and booked and ... a complete search of his person." Id., 625 P.2d at 1295, 1296 (citation omitted). As an example of the "rare instance" when custody would be appropriate for such a minor, arrestable traffic violation, the Easton court quoted the legislative history's reference to a situation where "the driver's license [that the arrested individual] displays may be sufficiently different from his physical description to project that he is proceeding under an alias and may be wanted." Id. at 1296. Thus, even when the police may arrest a traffic offender, the Oregon court has strictly limited detention to the "minimum necessary for identification and citation." Id. at 1294.
 
 
 28
 Here, the only basis for the custodial arrest and post-arrest detention was the claimed need to verify Pierce's identification for citation for a non-arrestable offense and the City's and County's practice of creating a complete identification record, including taking mug shots and finger-printing, even after the individual detained has been firmly identified. Given Oregon's stringent controls on booking for identification even when the underlying offense is arrestable, we conclude that the City's policy of allowing booking and mugging for firm identification for nonarrestable offenses is not authorized under state law. If the state has decriminalized conduct by denying the City and its officers the authority to arrest for a particular offense, then the City is acting unreasonably when it permits its officers to proceed as though they had the authority to arrest for the offense.
 
 
 29
 We agree with the Seventh Circuit that a particular arrest is objectively reasonable "so long as the police are doing no more than they are legally permitted and objectively authorized to do." United States v. Trigg, 878 F.2d 1037, 1041 (7th Cir.1989). Thus, in order for an arrest to be reasonable for Fourth Amendment purposes the arresting officer must have probable cause and must be "authorized by state and or municipal law to effect a custodial arrest for the particular offense." Id.; see also Thomas v. State, 614 So.2d 468, 471 (Fla.1993) (holding that a custodial arrest for a minor traffic citation not punishable by incarceration is unreasonable and violates the Fourth Amendment).
 
 
 30
 Because there was evidence from which the jury could have found that the City had an unconstitutional policy, or applied it in an unconstitutional manner, we conclude that the magistrate judge erred by directing a verdict for the City on Pierce's Monell claim. Accordingly, we reverse and remand.II. Jury Verdict for Karcher and Bowdle for Pierce's Excessive Force Claim
 
 
 31
 In addition, Pierce claims that the trial court erred by instructing the jury to apply an Eighth Amendment standard in determining whether officers Karcher and Bowdle applied excessive force to Pierce during the period that she was detained in the jail for identification. We agree. The determination of the appropriate constitutional standard to govern treatment during the various stages of custody is a question of law subject to de novo review. Graham v. Connor, 490 U.S. 386, 392-93, 109 S.Ct. 1865, 1869-70, 104 L.Ed.2d 443 (1989).
 
 
 32
 Defendants contend that the Eighth Amendment governs excessive force claims inside a jail facility. This claim must fail, however, because the Eighth Amendment's prohibition against the malicious or sadistic use of force, see Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), does not apply "until after conviction and sentence," Graham, 490 U.S. at 392 n. 6, 109 S.Ct. at 1870 n. 6; Ingraham v. Wright, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). Because Pierce was being detained merely for identification, she was not subject to punishment. Therefore, the defendants' assertion that Eighth Amendment malicious punishment standards apply to her claim is incorrect as a matter of law.
 
 
 33
 To decide the appropriate standard, we must determine what constitutional protection governs this particular juncture of the custodial continuum. See, e.g., Austin v. Hamilton, 945 F.2d 1155, 1158 (10th Cir.1991) (noting that "the custodial continuum run[s] through initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration"). Although the Graham Court held that the Fourth Amendment objective reasonableness standard governs claims based on the use of excessive force during arrest, it did "not resolve[ ] the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins." Graham, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10. However, it made clear that pre-trial detainees are protected by the Constitution from excessive force that amounts to punishment. See id. (noting that "the Due Process Clause protects a pretrial detainee from the use of excess force that amounts to punishment"); Redman v. County of San Diego, 942 F.2d 1435, 1441 (9th Cir.1991) (en banc) (applying the due process standard to a pretrial detainee who was raped by another inmate when he was transferred, after a week in the "young and tender" module, into an area housing the general jail population), cert. denied, 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). In another case involving an arrestee held for six days without arraignment or a probable cause hearing, we applied the substantive due process standard without considering whether the Fourth Amendment protections would apply, noting that such an individual "is entitled at least to the protections afforded pretrial detainees." Hallstrom v. City of Garden City, 991 F.2d 1473, 1485 (9th Cir.1993) (emphasis added), cert. denied, --- U.S. ----, 114 S.Ct. 549, 126 L.Ed.2d 450 (1993).
 
 
 34
 In a pre-Graham case, we held that the seizure that constitutes arrest "continues throughout the time the arrestee is in the custody of the arresting officers" and thus any use of excessive force during this extended arrest period is subject to the Fourth Amendment's constraints. Robins v. Harum, 773 F.2d 1004, 1010 (9th Cir.1985). Here, Pierce argues that the Fourth Amendment should also provide the standard for the conditions of detention, when an arrestee is kept at a facility for booking procedures without a probable cause or arraignment hearing. Thus, unless we assume that the initial seizure continues beyond the time that the arrestee is in the custody of the arresting officers, we must address the question not addressed in Hallstrom --whether the Fourth Amendment continues to protect an arrestee during the second custodial stage, post-arrest but pre-arraignment.
 
 
 35
 We find the discussions in Austin, 945 F.2d at 1158-60, and Powell v. Gardner, 891 F.2d 1039, 1043-44 (2d Cir.1989), persuasive. Individuals who have been arrested without a warrant and brought to a detention facility are subject to custodial detention involving isolation in a cell interspersed with the various administrative procedures of the booking process prior to arraignment or a probable cause hearing. We are persuaded by precedent which applies the Fourth Amendment standard to assess the constitutionality of the duration of or legal justification for a prolonged warrantless, post-arrest, pre-arraignment custody, see, e.g., County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); Gerstein v. Pugh, 420 U.S. 103, 125, 95 S.Ct. 854, 868, 43 L.Ed.2d 54 (1975); Hallstrom, 991 F.2d at 1477-83, that the Fourth Amendment should also apply to evaluate the condition of such custody. See Austin, 945 F.2d at 1158-60; Powell, 891 F.2d at 1043-44.
 
 
 36
 We hold, therefore, that the Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest. Accordingly, we conclude that the trial court erred by failing to direct the jury to apply Fourth Amendment objective reasonableness standards to the use of force against Pierce at the jail. We reverse the jury verdict for defendants Karcher and Bowdle.
 
 
 37
 III. Directed Verdict for Bowdle on Pierce's Fourth Amendment Unreasonable Seizure Claim
 
 
 38
 Pierce also claims that the magistrate erred by directing a verdict on Pierce's Fourth Amendment claim against Bowdle for unreasonable seizure. We find that this claim has merit.
 
 
 39
 Pierce alleged that Bowdle violated her Fourth Amendment rights by seizing her and returning her to a cell after she had been released from the detention center. The magistrate directed a verdict for the defendant based on Pierce's own testimony which indicated that she was still in the process of being released. However, we do not find that Pierce's testimony mandates the magistrate judge's conclusion. According to Pierce, Officer Bowdle asked if she wanted to go and said that she was being released. Based on these statements, a reasonable jury could find that although Pierce was still physically inside the detention center, she had been "released" because Bowdle had indicated that Pierce was free to go and by implication that the officer lacked any further authority to detain her. If this is the case, then a subsequent seizure could be in violation of Pierce's Fourth Amendment rights.
 
 
 40
 Because there was a basis for a reasonable juror to conclude that Bowdle's actions violated Pierce's Fourth Amendment rights, a directed verdict was inappropriate.
 
 
 41
 IV. Motion to Reinstate Multnomah County as a Defendant
 
 
 42
 Pierce claims that the trial court abused its discretion by denying her request to reinstate Multnomah County. We agree.
 
 
 43
 A denial of a motion for leave to amend after a responsive pleading has been filed is reviewed for an abuse of discretion, National Abortions Fed'n v. Operation Rescue, 8 F.3d 680, 681 (9th Cir.1993), "but such denial is 'strictly' reviewed in light of the strong policy permitting amendment," Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363, 371 (9th Cir.1992) (quoting Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798 (9th Cir.1991)). A "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The refusal to grant leave without any apparent justifying reason is an abuse of discretion. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). "Valid reasons for denying leave to amend include undue delay, bad faith, prejudice, and futility." California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1472 (9th Cir.1987), cert. denied, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). We find that the magistrate judge abused his discretion because there is no valid reason to deny Pierce's motion to reinstate the County as a defendant.
 
 
 44
 About one month before trial, Pierce inadvertently dropped the County from the suit by mistakenly copying the defendant's proposed order into her pre-trial order. Pierce, recognizing her mistake, quickly sought to correct it by moving to reinstate the County during the pre-trial conference. The magistrate judge denied this motion.
 
 
 45
 Although the magistrate judge did not state his reasons for denying Pierce's motion, the following facts are clear. The County had participated fully in the case until it was inadvertently dropped from the suit in January 1993, one month before trial.[7] The County's absence from the suit would have been for only a very brief time had the magistrate judge reinstated it as a defendant. It was prepared for trial. We conclude that the magistrate judge abused his discretion.
 
 
 46
 The magistrate judge's denial of Pierce's motion to amend her complaint to include the County is reversed. We remand to the district court with instructions to allow the filing of an amended complaint that includes the County.
 
 V. Other Claims
 
 47
 Because we reverse the verdicts, we need not reach Pierce's additional claims that the trial court erred by denying her motion for a new trial and her claims of error concerning various evidentiary rulings by the magistrate judge. However, because the defendants are no longer prevailing parties, we vacate the order awarding costs to the defendants. See Fed.R.Civ.P. 54(d).
 
 CONCLUSION
 
 48
 The order awarding costs to the defendants is VACATED. The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings in accordance with this opinion.
 
 
 49
 REVERSED and REMANDED.
 
 
 50
 RYMER, Circuit Judge, concurring in part and dissenting in part:
 
 
 51
 I join the majority's opinion except for Part I, where I agree with the result (but not the dicta) as to Duncan and disagree with both the reasoning and the result as to the City.
 
 
 52
 Whether or not Pierce had been identified adequately at the time Duncan decided to transport her to the county detention center for firm identification is an issue of fact that is disputed. This unresolved issue of fact bears on whether Duncan could reasonably have believed that taking Pierce to the detention center violated clearly established federal law. That is all that needs to be said, or that can be said on the state of the record. Therefore, the majority's apparent conclusion that Pierce's "de facto arrest by Duncan violated clearly established law because Duncan lacked authority to arrest her for identification after he had sufficient information for the issuance of the citation for the fare infraction," maj. op. at 1037-38, must simply be a statement that if all those things were true, he should not have qualified immunity in the majority's view.
 
 
 53
 I see no basis for reversing the directed verdict in favor of the City of Portland. No matter what the City did or did not "acknowledge" pre-trial, there is no evidence from which a reasonable factfinder could conclude that any policy existed--let alone a policy, practice or custom of "custodial detention for identification," or "custodial detention for identification even when there was no independently arrestable offense," or "custodial detention for firm identification on infractions," or "arrests for nonarrestable offenses," as the majority opinion variously characterizes it. There is no way that one can figure out what the City's custom or policy may have been from what officers Kane and Pittock testified was the practice at the county detention center, or from Kane's (erroneous) belief that ORS § 153.110 gave him authority to take an offender into custody to perform an identification check. Accordingly, I believe the district court should be affirmed.
 
 
 
 [1]
 Plaintiff is a graduate of Georgetown University Law School. She has not practiced law since 1984
 
 
 [2]
 Oregon Revised Statute 162.385 states as follows:
 (1) A person commits the crime of giving false information to a peace officer for a citation if the person knowingly uses or gives a false or fictitious name, address or date of birth to any peace officer for the purpose of the officer's issuing or serving the person a citation under authority of ORS 133.045 to 133.080, 133.110 and 156.050.
 (2) A person who violates this section commits a Class A misdemeanor.
 
 
 [3]
 Although Pierce appeals the directed verdict for Duncan in its entirety, which includes a state law malicious prosecution claim, her brief addresses only the Fourth Amendment claim. Therefore, we construe her claim on appeal as to Duncan as relating only to the Fourth Amendment claim, and we limit our decision accordingly. See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir.1988) (issues raised in brief but not supported by argument are deemed abandoned)
 
 
 [4]
 When Kane testified that he understood he had authority to take an offender into custody in order to perform an identification check, he relied on Or.Rev.Stat. § 153.110. That statute, however, specifically states that "[a]ny person authorized to issue citations pursuant to this section may not arrest for violation of the infraction but may detain any individual reasonably believed to have committed a violation, only so long as is necessary to determine, for the purposes of issuing a citation, the identity of the violator." Or.Rev.Stat. § 153.110(3) (emphasis added). As the statute does not itself authorize custodial detention, Kane's testimony certainly suggests that his employer the City had a policy of implementing the statute in such a way as to permit such detention
 
 
 [5]
 The City and Duncan also point to State v. Tucker, 286 Or. 485, 595 P.2d 1364 (1979). Although Tucker allows jail detention for identification when an officer has been given conflicting name and birthdate information, it interpreted a statute which provides for a full-fledged arrest for the offense involved. Section 153.110, however, states explicitly that the officer "may not arrest." Or.Rev.Stat. § 153.110(3); see also note 4 supra. Consequently, Tucker is not controlling here
 
 
 [6]
 153.110. Persons who may enforce infractions; issuance of citation; arrest prohibited
 (3) Any person authorized to issue citations pursuant to this section may not arrest for violation of the infraction but may detain any individual reasonably believed to have committed a violation ... only so long as is necessary to determine, for the purposes of issuing a citation, the identity of the violator and such additional information as is appropriate for law enforcement agencies in the state.
 Or.Rev.Stat. § 153.110(3).
 
 
 [7]
 The defendants argue that Pierce abandoned the County as a defendant nearly one year before trial in her Proposed Pre-trial Order of March 30, 1992. However, our examination of that document reveals that Pierce did not abandon her claims against the County at that time. To the contrary, she was vigorously asserting those claims. See, e.g., Plaintiff's Proposed Pre-trial Order, at 4 ("Plaintiff also maintains that the defendants Bawdle [sic], Karcher, and Multnomah County are liable under the pendent state claims and for the adoption of policy, ratification of conduct and/or under the doctrine of respondiat [sic] superior.") (emphasis added). Consequently, we find the defendants' factual assertion to be without basis