John Louis LaLONDE, Plaintiff–
Appellant,

v.

COUNTY OF RIVERSIDE, Robert
Moquin, and Jason Horton,
Defendants–Appellees.

No. 98–55887.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1999.

Filed Feb. 25, 2000.

948

Michael R. Mitchell, Law Office of Michael R. Mitchell, Los Angeles, California, for the plaintiff-appellant.

Michael A. Bell, Barbara A. Buchholz, and Robert M. Padia, Bell, Orrock & Watase, Riverside, California, Timothy T. Coates and Michael D. Fitts, Greines, Martin, Stein & Richland, Beverly Hills, California, for the defendants-appellees.

Before: BRIGHT,[1] REINHARDT, and TROTT, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge:

The plaintiff, John LaLonde, brought a civil rights action alleging that Officers Robert Moquin and Jason Horton (i) illegally entered his home without a warrant and (ii) used excessive force during and after his arrest. LaLonde claimed that the officers were both liable for these acts and that the County of Riverside was also liable on the excessive force claim. With regard to the illegal entry claim, the district court issued a pretrial order granting the officers qualified immunity. With regard to the excessive force claim, after the

plaintiff presented his final witness at a jury trial, the district court issued a judgment as a matter of law granting the officers qualified immunity and dismissing the plaintiff's claim against the County of Riverside. In all instances, the district court erred by failing to evaluate the facts in the light most favorable to the plaintiff and by resolving disputed issues of material fact. LaLonde's claims should have been heard and decided by a jury. The district court's decision is reversed in all respects.[2]

## Factual Background

John LaLonde lived in an apartment in Hemet, California, with his roommate Monica Jones and her three children aged three, six, and seven.[3] On July 21, 1996, LaLonde got off work around 11:30 p.m. He came home, changed his clothes, and then went to the store to get some groceries. He arrived back home shortly before midnight. He grabbed a sandwich and decided to play some video games. The walls between the neighboring apartments were thin, so that one could hear people's voices next door. That evening, LaLonde had heard some yelling, thumping, and banging from the apartment directly across the way. At this point though, it was a fairly quiet night inside LaLonde's apartment. The children were asleep and Jones was reading. LaLonde muted the volume on the television set in order not to disturb the others.

Either late that evening or in the early morning hours, LaLonde's neighbor Alycie Niemczyk, contacted the Riverside County Sheriff's Department to complain that LaLonde had been causing a disturbance.

---

1. The Honorable Myron H. Bright, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

2. LaLonde also asserted supplemental state law claims of trespass, civil battery, and false arrest. The district court premised its dismissal of LaLonde's state law claims on the dismissal of his federal claims. Because we reverse the dismissal of the federal claims, we

also reverse the dismissal of the state law claims.

3. Because this case requires evaluation of the facts in the light most favorable to the plaintiff, we generally set forth those facts as presented by LaLonde as well as those which are undisputed. Where appropriate, however, we also note disputed facts that are pertinent to the legal analysis that follows.

On at least three previous occasions, Niemczyk had contacted the police with unfounded complaints about excessive noise in the apartment complex. The landlord had also investigated her complaints and determined them to be false or unfounded.

Shortly after 1 a.m., Deputy Sheriffs Robert Moquin and Jason Horton arrived in response to Niemczyk's complaint. Officer Moquin claimed that, upon arrival, he heard yelling originating from LaLonde's residence. Officer Horton testified that he also heard people yelling, but described it as voices communicating back-and-forth and not sounding angry.

The officers first spoke with Niemczyk at her apartment. She told them that LaLonde, "had been causing a disturbance about an hour, within an hour prior." She also told them that LaLonde owned a rifle, which he kept in his house. Niemczyk also said that LaLonde had a hostile attitude toward law enforcement and that the officers should be careful because he might be willing to use the rifle. Niemczyk told Officer Moquin to speak with LaLonde first, and that if he cooperated, she would drop the complaint. If he did not cooperate, Niemczyk stated she was willing to make a citizen's arrest.[4]

Officers Moquin and Horton proceeded to LaLonde's apartment. Monica Jones, LaLonde's roommate, opened the door and Officer Moquin spoke with her. He asked if LaLonde was there. LaLonde walked into view and said "I'm right here." LaLonde appeared in his underwear and a T-shirt, holding a sandwich in his hand. He remained inside the apartment and did not at any time reach the doorway.

Moquin was standing outside the residence, about two to three feet from the door. According to LaLonde, Moquin asked him to step outside, and LaLonde

replied "No, I do not want to step outside." Moquin denies that he asked LaLonde to step out of his apartment, but does admit that he asked him to "come here" while the officer remained at the doorway. Moquin asked if he could enter the apartment. LaLonde responded "No," and added, "I will talk to you from inside the house."

Moquin explained to LaLonde that he was investigating a disturbing the peace complaint made by their neighbor, Ms. Niemcyzk. LaLonde responded that the complaint was "bullshit, because ... it had been an ongoing harassment thing with her. She had done this several times in the past, bogus complaints to the property management people." Moquin stated that he was conducting an investigation and that LaLonde was a suspect. Officer Moquin testified that LaLonde answered, "You don't know what you're talking about."

According to LaLonde, at this point, Officer Moquin tried to reach in and grab him by the shirt. In contrast, Moquin testified that LaLonde turned and headed toward the interior of his apartment, which was the reason he reached in and tried to grab him. LaLonde denied that he made any physical movement before Moquin crossed the threshold of the door and entered his apartment: LaLonde testified that Moquin "tried to reach in and snatch me out of the apartment.... He reached in and grabbed a hold of the front of my T-shirt. At that point I stepped backward. My T-shirt ripped ..." LaLonde testified that Officer Moquin then advanced on him.[5] At this point, LaLonde told Moquin he wanted a watch commander, a request which he repeated a number of times.

Officer Moquin told LaLonde he was going to be placed under arrest for ob-

---

**4.** The officers had a citizen's arrest form with them, but Niemczyk did not sign it prior to LaLonde's arrest.

**5.** LaLonde's roommate Jones had put her arm across the door and said, "Wait a minute. You can't just force your way into my

house." Moquin clubbed Jones with his flashlight and moved into the apartment after LaLonde. (Moquin, of course, denies that the events occurred in the manner reported by LaLonde and Jones.).

structing a police investigation. Moquin asked LaLonde if he would submit to being arrested. LaLonde said no, not after seeing the officer strike a woman in his house. Moquin grabbed LaLonde's hands and knocked the sandwich to the floor. LaLonde reached down for the sandwich, while telling Moquin, "Don't tear up my house. You know, I worked to get it." Officer Moquin grabbed LaLonde by his ponytail and knocked him backwards to the ground. Moquin then straddled LaLonde and began to pin him down in order to handcuff him. LaLonde resisted and the two men got into a scuffle.

Officer Moquin then sprayed LaLonde's face with oleoresin capsicum pepper spray. At that point, LaLonde's resistance ceased. Officer Horton had now also entered the apartment and had begun helping his partner handcuff LaLonde. While performing the handcuffing, Officer Horton forcefully put his knee into LaLonde's back, causing him significant pain.

The officers then let LaLonde sit on his couch and brought Jones in to sit with him. Officer Horton asked LaLonde and Jones where the rifle was kept. LaLonde said he kept a rifle in the kitchen. Officer Horton found an unloaded rifle on top of a shelf in the rear of the kitchen.

For twenty to thirty minutes, LaLonde sat on the couch with his hands handcuffed and the pepper spray burning his face. LaLonde testified "when my wrists started to really bother me bad, I said something about it." LaLonde told the officers, "These handcuffs are too tight. They're cutting off my circulation." The officers told LaLonde if he would only hold still, he would be fine. LaLonde told the officers: "If I could hold still, I would, but the pepper spray was burning like hell." [6] LaLonde testified that the pepper spray felt "like having turpentine poured on you." "The longer it sat on there, like the more it burned.... I felt like it was on fire." LaLonde was visibly in pain. He was red around his eyes, mucus was hanging from his nose, and tears were running down his face.

Officer Moquin was trained in the use of pepper spray. He knew it caused swelling of the mucus membranes, involuntary closing of the eyes, gagging, coughing, and an intense burning sensation. Officer Moquin testified that he observed mucus coming out of LaLonde's nose and tears flowing from his eyes. He knew that the symptoms of the pepper spray could last up to forty-five minutes if left untreated. He was also trained to know that, after spraying someone, he should take all possible steps to assist them, such as splashing water to flush out the person's eyes. Officer Moquin testified, "I was taught to offer first aid when possible." However, Officer Moquin stated baldly, "I did not offer [LaLonde] any first aid whatsoever." [7] Officer Horton made a similar set of admissions. Officer Horton, on the other hand, tried to offer some excuse. He testified that LaLonde was still combative and, for that reason, "if I was to render any type of first aid ... it may jeopardize my safety." [8]

After twenty to thirty minutes passed, two other police officers arrived. Almost immediately they got a wet dish towel from the kitchen and wiped LaLonde's face. LaLonde was not taken to the police

---

**6.** The appellees state that LaLonde did not specifically ask for the pepper spray to be removed, and LaLonde acknowledged this at trial. When LaLonde complained to the officers that the pepper spray was "burning like hell," the officers told him that part of their training involved exposure to pepper spray and it wasn't all that bad.

**7.** Immediately after this series of admissions, the defense counsel, instead of proceeding to cross-examination, moved for qualified immunity and a directed verdict on the issue of excessive force. When the trial proceeded, the defense counsel made no effort to counter Officer Moquin's admissions of deliberately failing to administer first aid despite his training and knowledge of LaLonde's suffering.

**8.** According to LaLonde, his resistance had completely ceased after he was sprayed and handcuffed.

station and he did not receive any citation that evening.[9]

The next day, LaLonde's back was in pain and his left wrist and left hand were numb. He sought medical treatment at Hemet Urgent Care, but was not put on prescription medication. He maintained a log to record his daily level of pain for one of his doctors. As of the time of trial, he still continued to feel severe headaches and back pain on a daily basis, and occasionally his arms and hand would go numb. LaLonde did not have any of this pain before the incident.

LaLonde filed a 42 U.S.C. § 1983 action against Officer Moquin, Officer Horton, and the County of Riverside. LaLonde claimed that the officers violated his Fourth Amendment rights by: (1) illegally entering his home without a warrant; and (2) using excessive force, in particular the knee in his back, the tight handcuffing, and the unnecessarily prolonged exposure to pepper spray. LaLonde also claimed that the County was liable for his back injury because Officer Horton's method of handcuffing him—which allegedly caused his back injury—was pursuant to the official policy of Riverside County Sheriff's Department.

The district judge dismissed all of LaLonde's claims. On the issue of illegal entry, the court conducted a pre-trial evidentiary hearing and granted summary judgment to the officers on the ground of qualified immunity. LaLonde's excessive force claims were heard by a jury, but, after the plaintiff's final witness, the court granted the defendants' motion for judg-

ment as a matter of law on that same ground. In the judgment as a matter of law, the district court also dismissed the action with respect to the County of Riverside on the merits.

### Analysis

### I. Warrantless entry in the home

■■■ The district court held what it called a pretrial "evidentiary hearing regarding qualified immunity" to determine whether the plaintiff's claim of illegal entry should proceed to a jury trial. The court's pretrial order granting qualified immunity amounted to a *sua sponte* summary judgment. A district court's pre-trial order granting defendants qualified immunity should be upheld if, considering the facts and inferences in the light most favorable to the plaintiff, the officials were entitled to qualified immunity as a matter of law. The defendants are entitled to qualified immunity, unless a reasonable officer would have known that the conduct at issue was unlawful under clearly established law. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993). If, however, there is a material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial, before a jury if requested.[10] *Id.* For purposes of this appeal, we

---

**9.** The report by Officer Moquin was transferred to a prosecutor and LaLonde was later charged with disturbing the peace and resisting arrest. The charges were subsequently dropped.

**10.** The district court erred in basing its decision for summary judgment on its adverse factual findings against the plaintiff. The court should have determined whether the officers were entitled to qualified immunity as a matter of law on the basis of undisputed facts and, where material facts were disputed,

on the plaintiff's version of events. Considering the facts in this light, once the plaintiff established that material issues of fact existed, the court was required to submit the factual dispute to a jury. *Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir.1997) ("[W]here there is a genuine issue of fact on a substantive issue of qualified immunity, ordinarily the controlling principles of summary judgment and, if there is a jury demand and a material issue of fact, the Seventh Amendment, require submission to a jury."). Alternatively, we

view the facts, as the district court should have but did not, in the light most favorable to LaLonde and accept his version of all material disputed facts.

The district court upheld the officers' warrantless entry into the plaintiff's home on two grounds: (1) the officers had probable cause to arrest LaLonde for disturbing the peace; (2) the officers were faced with exigent circumstances due to the threat of armed resistance. On appeal, the officers raise two additional claims. They argue that LaLonde's Fourth Amendment rights were not violated because he voluntarily exposed himself to public view by coming to the threshold of the door. They also argue that probable cause was not required because their initial seizure of him for investigatory purposes was minimal. We address each of these arguments below.

## A. Probable cause

■ The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause *and* are presented with exigent circumstances. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir.1978) ("[A]bsent exigent circumstances, police who have probable cause to arrest a felony suspect must obtain a warrant before entering a dwelling to carry out the arrest."). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S.Ct. 1371.

The district court's oral explanations for its order granting qualified immunity and the order itself suggest that the court believed that the existence of probable cause, without more, was sufficient to justify the warrantless entry into LaLonde's home. This legal conclusion is directly contrary to controlling precedent: it is well settled

constitutional law that, absent exigent circumstances, probable cause alone cannot justify an officer's warrantless entry into a person's home. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir.1999) (citing *White v. Pierce County*, 797 F.2d 812 (9th Cir.1986)).

■ The officers also make the novel argument that their seizure of LaLonde should not be held to the standards of probable cause, but should instead be evaluated under the less onerous requirements of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The argument is premised on the notion that the initial seizure of LaLonde did not constitute an arrest, but rather involved the less intrusive measure of a temporary detention for investigation. We disagree with this line of argument. First, Supreme Court and Ninth Circuit cases unequivocally hold that probable cause is a precondition for any warrantless entry to seize a person in his home. *See, e.g., Calabretta*, 189 F.3d at 813; *Welsh*, 466 U.S. at 749–50, 104 S.Ct. 2091. Moreover, in an en banc decision, this court squarely rejected the proposition that *Terry*'s reduced standards can be applied to a warrantless entry to search for property within the home, even when the search involves a highly limited intrusion. *United States v. Winsor*, 846 F.2d 1569 (9th Cir.1988) (en banc). *Winsor* relied heavily on the fact that the home is perhaps the most sacrosanct domain and that, there, Fourth Amendment interests are at their strongest. *Id.* at 1577–78. The same is equally true for a warrantless entry to seize a person within his home. As the Supreme Court stated in *Payton*, "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 590, 100 S.Ct. 1371. In fact,

could view the district judge's *sua sponte* actions as constituting a bench trial on the issues he decided. *Id.* In such case, our analysis and result would still be the same.

*Payton* specifically reversed the lower court opinion which had relied on the premise that a warrantless entry to seize a person within a home can be held to a lower standard than a warrantless entry to search and seizure property within a home. *See id.* at 589, 100 S.Ct. 1371; *id.* at 588, 100 S.Ct. 1371 (approving Judge Leventhal's "reason[ing] that the constitutional protection afforded to the individual's interest in the privacy of his own home is equally applicable to a warrantless entry for the purpose of arresting a resident of the house … an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection"). The reasons that gave rise to the rule in *Terry* are simply not applicable to a warrantless entry to seize a person within his home. *Cf. Winsor,* 846 F.2d at 1576 ("The general rule is that seizures and searches must be supported by probable cause. At the same time, the Court has recognized a narrowly defined exception to this general rule …. if the intrusion on Fourth Amendment interests is minimal…. Generally speaking, the Supreme Court has defined a minimally intrusive seizure as one that occurs in public and is brief.") (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

## B. Arrest at the doorway

■■ The Fourth Amendment's prohibition on warrantless entry into an individual's home does not apply to arrests made at the doorway, because the doorway is considered a public place. *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Vaneaton,* 49 F.3d 1423, 1427 (9th Cir.1995). In the present case, however, neither party contends that the officers attempted to arrest LaLonde at the doorway. While the officers were standing at the doorway, they sought to ask LaLonde, who was standing a few feet inside the apartment, some questions about a disturbing the

peace complaint. The arrest took place only after the officers had crossed the threshold of the door and entered LaLonde's apartment. Thus the present case does not fall under the doorway exception. *See, e.g., New York v. Harris,* 495 U.S. 14, 15–18, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (warrantless arrest once inside the home violated *Payton* though officers might have been able to arrest individual at doorway); *Vaneaton,* 49 F.3d at 1427 ("The police did not enter the house until they formally placed Vaneaton under arrest."); *cf. United States v. Johnson,* 626 F.2d 753, 757 (9th Cir.1980) ("This case, on the other hand, differs from both of the situations addressed in *Payton.* The illegal search of Payton's home and the illegal arrest of Riddick did not occur until the police had entered the suspect's[sic] homes. In this case, we are confronted with the situation where the suspect was arrested as he stood inside his home and the officers stood outside his home….").

Based in part on the doorway exception and relying on *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the officers also argue that they were entitled to pursue LaLonde into his apartment after he turned and began to retreat. In *Santana,* however, the officers first arrested the suspect at the doorway, and she then retreated into her home. In fact, the *Santana* Court began its legal analysis with: "the first question we must decide is whether, when the police first sought to arrest Santana, she was in a public place." *Id.* at 42, 96 S.Ct. 2406. Here, however, it is undisputed that the officers first arrested LaLonde only after they were inside his home. Furthermore, the decision in *Santana* turned on exigent circumstances related to Santana's crime— it was a "hot pursuit" case. If the officers had not chased Santana into her home, "any delay would have resulted in the destruction of evidence"—in that case, packets of narcotics. *Id.* at 43, 96 S.Ct. 2406. In LaLonde's case, however, there was no

evidence relating to the suspected crimes—disturbing the peace and obstructing an investigation—that he could destroy or that might be altered if the officers left him alone and came back later with a warrant. Moreover, Santana was a felony suspect while LaLonde was suspected only of a misdemeanor, and the Supreme Court has explained that an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home. *Welsh v. Wisconsin*, 466 U.S. 740, 752–53, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In the present case, the defendants do not even suggest an exigency directly related to the misdemeanor allegations. We note, as the Court did in *Welsh*, that "it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor.... [A]pplication of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when· there is probable cause to believe that only a minor offense ... has been committed." *Id.* at 753, 104 S.Ct. 2091.[11]

## C. Exigent circumstances of officer safety

The appellees argue that independent exigent circumstances concerning officer safety justified their entry into LaLonde's home. *See, e.g., United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc) (exigent circumstances include situations "that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons"). They rely in particular on the fact that LaLonde's neighbor warned them that he owned a rifle, that he was hostile to law enforce-

ment, and that they should be careful because he might be willing to use the weapon. With this knowledge, the officers contend they were presented with sufficient exigent circumstances at the point LaLonde appeared hostile or, alternatively, when LaLonde made a move toward the kitchen, possibly, they thought, to retrieve his rifle.[12]

■ In evaluating the officers' contentions, the district court erroneously concluded that "only a mild exigency need be shown where entry can be accomplished without physical destruction of property." This rule, insofar as it ever reflected Ninth Circuit precedent, is no longer good law. Supreme Court and Ninth Circuit cases have strictly limited the exigency exception, especially in the context of warrantless arrests in the home. In *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the Supreme Court explained:

> [T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions, *see, e.g., United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (ongoing fire), and has actually applied only the "hot pursuit" doctrine to arrests in the home.

---

11. In *Welsh*, the Supreme Court even suggested that "the Fourth Amendment may impose an absolute ban on warrantless home arrests for certain minor offenses." *Welsh*, 466 U.S. at 750 n. 11, 104 S.Ct. 2091.

12. At oral argument, the appellees made clear their contention that LaLonde's alleged hostility in response to the investigation was suffi-

cient to create exigent circumstances in light of the neighbor's advice and information. Indeed, in their brief, the officers argue that their actions were justified "whether LaLonde turned or merely stepped back, whether before, simultaneously or *after Moquin touched his shirt.*" (Emphasis added.)

*Welsh,* 466 U.S. at 749–50, 104 S.Ct. 2091; *see also Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In describing the "heavy burden" outlined in *Welsh,* we have explained that police "can meet that burden only by 'demonstrat[ing] specific and articulable facts to justify the finding of exigent circumstances.'" *United States v. Shephard,* 21 F.3d 933, 938 (9th Cir.1994) (quoting *United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985)). We have also explained that "this burden is not satisfied by leading a court to speculate about what may or might have been the circumstances." *Driver,* 776 F.2d at 810; *see also United States v. George,* 883 F.2d 1407, 1411 (9th Cir.1989).

In some cases, however, we have strayed from this conventional analysis of exigency. In *McConney,* we explained that a "mild exigency" is sufficient to justify entries conducted without physical destruction of property while "more specific inferences of exigency" are necessary to justify entries involving property damage. *McConney,* 728 F.2d at 1206. Although *McConney* was a "knock and announce" warrant-based entry case, we have applied its "mild exigency" analysis in a handful of warrantless entry cases as well. *See Murdock v. Stout,* 54 F.3d 1437, 1442 (9th

Cir.1995); *United States v. Lai,* 944 F.2d 1434, 1443 (9th Cir.1991); *United States v. Arias,* 923 F.2d 1387, 1391 (9th Cir.1991); *United States v. Hicks,* 752 F.2d 379, 383–84 (9th Cir.1985).

No other circuit followed our property-based exigency rule,[13] and, in *United States v. Ramirez,* 523 U.S. 65, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998), the Supreme Court squarely rejected it. *Ramirez,* 118 S.Ct. at 996 ("Applying Circuit precedent, [the Ninth Circuit] concluded that while a 'mild exigency' is sufficient to justify a no-knock entry that can be accomplished without the destruction of property, 'more specific inferences of exigency are necessary' when property is destroyed. It held that this heightened standard had not been met on the facts of this case. We granted certiorari and now reverse."). The Court held that the reasonableness of the entry and the evaluation of exigent circumstances "depend[ ] in no way on whether police must destroy property in order to enter." *Id.* at 996. Although *Ramirez* was a "knock and announce" case, the Court's invalidation of our rule for evaluating exigencies differently according to whether the physical destruction of property occurs is equally applicable in warrantless entry cases.[14] The Supreme Court's rationale was simple. A "height-

---

**13.** The only case in any other circuit to refer to our rule was *United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir.1995), in which the court cited *Murdock v. Stout* and described the rule in a parenthetical. One other case alluded to the concept of property damage as an element but did not mention our rule. *See United States v. Stewart,* 867 F.2d 581, 584 (10th Cir.1989) ("The conclusion of exigency ... must be especially clear in this case where there was no knock or warning whatsoever, where there was no information as to who was in the house, where the destruction of physical property took place, and where the occupants of the residence could be injured as a result of the entry.").

**14.** Notably, *Ramirez*'s abrogation of the mild exigency rule in warrantless entry cases would not change the outcome of those cases. In our warrantless entry cases, circumstances that we held or implied met the mild exigency standard meet the traditional exigency stan-

dard. *See Murdock,* 54 F.3d at 1442 (exigency based on phone call and evidence of burglary in progress and signs that resident of home was in danger or injured); *Lai,* 944 F.2d at 1443(exigency based on evidence that drug gang would destroy evidence or arm themselves if police did not respond immediately); *Arias,* 923 F.2d at 1391 (exigency exception based on occupants' destroying evidence or arming themselves); *Hicks,* 752 F.2d at 383–84 (exigency based on evidence that cocaine would be destroyed if police did not enter home immediately). Indeed, in those cases, we often mentioned the mild exigency standard in dicta or as an afterthought, *see, e.g., Lai,* 944 F.2d at 1442 ("We do not find it necessary to determine exactly where on the continuum from mild to severe exigency the case at bar lies."); *Murdock,* 54 F.3d at 1442, but we never approved a warrantless entry based on an exigency that failed to meet the traditional exigency standard.

ened standard" is not warranted because damage to property occurred.[15] The *Ramirez* decision said nothing to suggest the Court was adopting a new standard of exigency that differed from the traditional standard that it has always applied in Fourth Amendment cases or that the Court was abandoning any of its prior exigent circumstances precedent. It overruled none of its existing case law. In other words, the *Ramirez* Court was not adopting a new "mild exigency" standard to replace its past general exigent circumstances law. It was, instead, simply maintaining the status quo and preserving stare decisis. In sum, *Ramirez* reaffirms the principle that only one standard of exigency exists regardless of whether the destruction of property is involved in gaining entry to an individual's home. Thus, we apply traditional exigent circumstances case law here.

■ Taking the facts in the light most favorable to the plaintiff, no exigent circumstances existed. According to the plaintiff, he stood peacefully inside his home, talking to the officers who were at the doorway, when he was grabbed by the shirt and then tackled by Officer Moquin. He had not resisted the officers or given them any cause to grab him, let alone force their way into his apartment, and arrest him. Further, the plaintiff specifically "denie[d] turning his back or backing— much less walking—toward the kitchen before Moquin entered the residence." Based on these facts, nothing whatsoever happened to present the officers with a threat to their safety; accordingly, a reasonable officer could not have believed the entry was lawful in light of clearly established law.[16]

## D. Conclusion

In view of the above, the district court's pre-trial grant of qualified immunity to the officers with respect to the claim of illegal entry was erroneous in both respects: without more, probable cause is not enough to justify an entry; and no exigent circumstances existed. A reasonable officer would have known that such was the clearly established law.

## II. Excessive force

■ After a jury was sworn and the plaintiff presented his evidence, the district court issued a judgment as a matter of law granting the defendants qualified immunity on the claims of excessive force.

15. The Court explained that "[t]his is not to say that the Fourth Amendment speaks not at all to the manner of executing a search warrant.... Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search not subject to suppression." *Ramirez,* 118 S.Ct. at 996.

16. The officers' contention that the situation became hostile is also contested by LaLonde. However, to the extent that the officers reasonably perceived LaLonde to be antagonistic, they were still not at liberty to enter his apartment under these circumstances. The neighbor's allegation that LaLonde was causing a disturbance was put into doubt by LaLonde's statement to the officers that she had a history of harassing him with false complaints. Moreover, the officers' assertion of a potential threat to their safety must be viewed in the context of the underlying offense. As we have explained, "the gravity of the underlying offense is an essential component of the exigency calculus. One suspected of committing a minor offense would not likely resort to desperate measures to avoid arrest and prosecution." *George,* 883 F.2d at 1413 n. 3. The mere fact that a person owns a rifle and does not like law enforcement officials does not in itself allow police officers to enter the person's home and seize him simply because he is unwilling to step into the public domain for questioning, even if probable cause exists to believe that some offense has been committed. LaLonde's contention that the situation did not become hostile until Officer Moquin first seized him inside the apartment resolves the question, given that all facts and inferences must be evaluated in the light most favorable to the plaintiff. Based on the facts alleged by LaLonde, a jury could reasonably have concluded that the officers were not presented with a threat to their safety justifying the warrantless entry into his home. Under those facts, he was entitled to overcome the summary judgment motion.

We review a judgment as a matter of law de novo. *Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir.1999). Such a judgment is appropriate when the evidence permits only one reasonable conclusion. *Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir.1998). The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Amarel v. Connell*, 102 F.3d 1494, 1521 (9th Cir.1996). If conflicting inferences may be drawn from the facts, the case must go to the jury. *Pierce v. Multnomah County*, 76 F.3d 1032, 1037 (9th Cir.1996).

■ Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *White v. Pierce County*, 797 F.2d 812, 815 (9th Cir.1986). Determining whether force used in making an arrest is excessive or reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. We have recently reiterated that the test for qualified immunity in excessive force cases is the same as the test on the merits. *Katz v. United States*, 194 F.3d 962, 968 (9th Cir.1999).

Here, LaLonde raises three related claims of excessive force. We discuss them sequentially.

### A. Back injury

■ LaLonde alleged that Officer Horton seriously injured his (LaLonde's) back by using excessive force while handcuffing him. There was a factual dispute concerning whether the officer had placed his knee in LaLonde's back or near his shoulder blade. The district court erred by issuing a judgment as a matter of law on this claim. First, the district court clearly erred by relying on Officer Horton's trial testimony and deciding that LaLonde's description of the events was inaccurate. By issuing adverse factual findings as a basis for a judgment as a matter of law, the district court ignored the applicable law. *Amarel*, 102 F.3d at 1521; *Pierce*, 76 F.3d at 1037. Considering the facts in the light most favorable to the plaintiff, a jury could decide that Officer Horton's actions violated the Fourth Amendment's prohibition on excessive force. LaLonde admits that he initially resisted arrest—one of the factors in *Graham* for determining reasonableness. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. However, if the extent of the injury to LaLonde's back is serious enough, a jury could conclude that Horton used force in excess of what was reasonable, even if LaLonde had been resisting at the time. Also, another factor weighing in LaLonde's favor is the fact that he was being arrested for a relatively minor offense. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Considering the facts in the light most favorable to him, LaLonde had the right to have the jury assess the evidence supporting this claim of excessive force.[17]

---

**17.** Our concurring and dissenting colleague, Judge Trott, agrees with our basic holding as to the illegal entry claim ("the unlawful seizure and arrest claim") as well as with our holding regarding the part of the excessive force claim involving the use of pepper spray. The only holdings regarding LaLonde's claims against the officers with which Judge Trott disagrees are those in which we find a genuine issue of facts as to (a) the tight handcuffing and (b) the back injury. As to the latter, Judge Trott bases his difference of opinion on the assertion that "[t]here is no doubt from

this record, none whatsoever, that LaLonde was resisting arrest when this force [to LaLonde's back] was applied." There is, however, not only doubt in the record, but direct contradictory testimony on the matter. LaLonde testified that after Officer Moquin sprayed him with pepper spray he stopped all resistance to the officers' efforts to arrest and handcuff him:

QUESTION (LALONDE'S ATTORNEY): NOW, AFTER BEING SPRAYED WITH THE

## B. Tight handcuffs

 Despite LaLonde's arguments and evidence, the district court ignored his handcuffing claim. During the proceedings, the court orally explained its reasons for approving the motion for judgment as matter of law on the outstanding claims. However, the court did not mention two of the plaintiff's claims: (a) the officers tightly handcuffed him and refused to loosen the cuffs when he complained; and (b) the officers permitted the oleoresin capsicum pepper spray to remain on his face for an unnecessary period of time. LaLonde's counsel then brought these two claims to the court's attention once again. In response, the court addressed the pepper spray issue, but not the tight handcuffing claim, and the court's written order simply continued to ignore the latter claim.

A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force. *See, e.g., Palmer v. Sanderson,* 9 F.3d 1433 (9th Cir.1993); *Hansen v. Black,* 885 F.2d 642 (9th Cir.1989). The issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses. According to the facts alleged by LaLonde, it is difficult, if not impossible, to say that the only reasonable conclusion that the evidence permits is that the force used was reasonable; therefore this aspect of the case should also have gone to the jury. *Lawson v. Umatilla County,* 139 F.3d 690, 692 (9th Cir.1998).

## C. Unnecessarily prolonged exposure to pepper spray

 LaLonde's third claim of excessive force is that the officers deliberately made him suffer unnecessarily prolonged exposure to the pepper spray. According to the testimony of LaLonde and his roommate, the officers left the pepper spray on LaLonde's face and in his eyes, for twenty to thirty minutes after he had already surrendered and was under control.[18] During this period, LaLonde was seated on his couch with his hands handcuffed behind his back. He was blinded by the pepper spray for that entire time and, as he testified, "[t]he longer it sat on there, like the more it burned.... I felt like it was on fire." LaLonde told the officers that the pepper spray was "burning like hell." The officers observed mucus coming out of LaLonde's nose and tears flowing from his eyes. The officers were trained to know that the symptoms of the pepper spray could last up to forty-five minutes if left untreated. The officers also

PEPPER SPRAY, DID YOU RESIST BEING HANDCUFFED?
ANSWER: NO, SIR.
According to LaLonde, it was after he ceased resisting that Officer Horton deliberately dug his knee into LaLonde's back with a force that caused him long-term if not permanent back injury. The outcome of this issue will necessarily depend on how the jury views the facts after hearing the witnesses. For summary judgment purposes, we may consider only one side's version—LaLonde's. Assuming his statements to be true, a jury verdict in his favor could not be overturned as a matter of law.

As to Judge Trott's difference with us regarding the claim that the handcuffs were excessively tight and that the officers refused to loosen them, we fail to see why this is not simply a matter for the jury as well. If LaLonde's statements are true, the force was not only excessive but wilfully so. *See* Part II, Section B. Judge Trott cites no case suggesting that the facts presented by LaLonde are not adequate to overcome a summary judgment motion.

18. The district court concluded, despite plaintiff's objection, that no evidence had been presented at trial indicating that the time period was twenty to thirty minutes. The court's factual finding was clearly erroneous. The record reflects that, on several occasions, witnesses either suggested or explicitly stated that this period lasted twenty to thirty minutes. More important, the difference between ten minutes and twenty to thirty minutes is irrelevant for a jury's determination of excessive force in this case. A jury could reasonably conclude that the officers' deliberately allowing the plaintiff to suffer the consequences of the pepper spray after he had fully surrendered and was under their control constituted excessive force, regardless of whether the time his face "felt like it was on fire" was ten minutes or half an hour.

acknowledged that during their training they were instructed that, after spraying someone, they should offer first aid whenever possible, such as splashing water to flush out the person's eyes. However, Officers Moquin and Horton did not offer LaLonde any assistance whatsoever. By contrast, when Officers Pike and Lampkin arrived on the scene, one of them almost immediately got a wet towel from the kitchen to flush LaLonde's face with water.

 In the context of police canines, this court has explained that "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control." *Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir. 1994); *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998). The same principle is applicable to the use of pepper spray as a weapon: the use of such weapons (e.g., pepper sprays; police dogs) may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.

## D. Exclusion of medical evidence

 The district court also erred by preventing LaLonde from introducing medical evidence, in particular testimony by a medical expert concerning the injuries the plaintiff suffered. *Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994) (" 'The reasonableness of force is analyzed in light of such factors as . . . the extent of the injury inflicted.' ") (quoting *White v. Pierce County,* 797 F.2d 812, 816 (9th Cir. 1986)); *cf. Hansen v. Black,* 885 F.2d 642, 645 (9th Cir.1989) (excessive force case involving medical reports and medical testimony to prove the extent of the injury); *Palmer v. Sanderson,* 9 F.3d 1433 (9th

Cir.1993) (same). In LaLonde's case, such evidence could, among other things, have helped to establish the force of the pressure applied to his back and to shed light upon the dispute between LaLonde and Officer Horton concerning where the officer placed his knee on LaLonde's body. It was therefore error to preclude the testimony by LaLonde's medical expert.

## E. Testimony for the *Monell* claim

 The district court improperly limited LaLonde's efforts to elicit testimony from Officer Horton for purposes of proving the County's liability. The court, by sustaining an objection made by defense counsel, precluded Horton from testifying whether his putting his knee in LaLonde's back was in accordance with the official policy of the Riverside County Sheriff's Department. The defense counsel, however, did not state any ground for his objection, nor did the court offer any reason for sustaining it. On appeal, the officers now suggest, as the ground for excluding the testimony, that LaLonde failed to establish that Horton was competent to testify about the official policies of the Sheriff's Department. The question demanded of Horton, however, was no different in kind from those that had preceded it. Officer Horton had already testified about the official policy of the Sheriff's Department concerning its techniques for handcuffing. Horton had also testified that he was trained by the Department to use those techniques when handcuffing people. Horton then testified to the technique he used to handcuff LaLonde. The only remaining question was whether the technique he used on LaLonde was in accordance with the official policy that he was taught at the Sheriff's Department. There can be no doubt that Horton was competent to testify as to whether the action he took was an action he had been taught during his Sheriff's Department training. The erroneous ruling prejudiced the plaintiff's ability to prove that the County was liable for Horton's use of ex-

cessive force in accordance with *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, the judgment in favor of the County must be reversed.

## Conclusion

LaLonde's allegations, if taken to be true, constitute a clear violation of his Fourth Amendment rights. The officers were not entitled to qualified immunity as a matter of law. Rather, LaLonde was entitled to have a jury evaluate his complaints against the officers and the County. The district court's pre-trial order and its subsequent judgment as a matter of law are reversed. The case is remanded to the district court so that the plaintiff's claims against all defendants may be considered by a jury.

REVERSED and REMANDED.

TROTT, Circuit Judge, (Concurring in part and Dissenting in part):

The level of excruciating detail to which the majority opinion must resort to answer the question of whether Officer Moquin's actions at the doorway of John LaLonde's apartment were reasonable illustrates one of the serious and perplexing problems police officers face when they attempt in the field to enforce our laws: only a skilled lawyer steeped in the labyrinthine intricacies of the Fourth Amendment can hope to divine the correct answers. The majority's scholarly solution is certainly impressive, but reading it makes one wonder how a police officer faced with unknown protagonists and antagonists in unfamiliar and potentially hostile circumstances can be expected to react to an extemporaneous drama while at the same moment measuring split second occurrences in constitutional terms. In cold print, the events of July 21, 1996, appear one way, but as they were unfolding two and a half years ago, they surely had a different cast and immediacy.

It is because of this harsh reality that we have adopted for members of our exec-

utive branches of government the doctrine of qualified immunity. This doctrine protects law enforcement officers from lawsuits for damages predicated upon discretionary acts reasonably performed, even when in the sunlight of hindsight it turns out that the act cannot be squared with constitutional rights. As the Supreme Court explained in *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), "[t]his accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Id.* at 229, 112 S.Ct. 534 (quoting *Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Accordingly, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Thus, although a court might suppress the fruits of a seizure as acquired by means of a violation of the Fourth Amendment, the officer who conducted the seizure might well be immune from a private law suit for damages.

*Hunter* sends an unmistakable message: if a reasonable officer could have believed his challenged action to be lawful in light of clearly established law and the information the officer possessed, the officer taking that action is entitled to immunity from suit, even if the officer's judgment turns out to have been mistaken. Moreover, "because 'the entitlement is an *immunity from suit* rather than a mere defense to liability,' we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 227, 112 S.Ct. 534 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original)).

After measuring this record by the Supreme Court's rules, and looking at it in the light most favorable to LaLonde's alle-

gations, I conclude that Officer Moquin did not establish pre-trial an entitlement to qualified immunity with respect to La-Londe's Fourth Amendment claims. If LaLonde is to be believed, a reasonable police officer knowing what this officer knew when he approached LaLonde's doorway on a neighbor's complaint—coupled with LaLonde's disputatious behavior—could not have believed he was justified in reaching into LaLonde's apartment and grabbing him by the shirt in an attempt to extricate him from the apartment. According to LaLonde, he was passively standing in his apartment when Officer Moquin grabbed him. Given La-Londe's version of the facts, no reasonable officer at that juncture, could have believed that probable cause, or for that matter even reasonable suspicion, existed to restrain LaLonde in this fashion.

Officer Moquin, on the other hand, disputes LaLonde's version of the facts. The officer says that he grabbed LaLonde because a hostile LaLonde turned and headed into his apartment. Moquin's reason for this act was his concern that an obviously agitated LaLonde was going for his rifle, as warned about by the complaining witness.

If the undisputed facts were as related by Officer Moquin, I would conclude with no hesitancy that Officer Moquin was entitled to qualified immunity. A reasonable officer confronted with a disputatious suspect who a complaining neighbor said had a rifle and might use it against law enforcement could easily have believed the suspect was dangerous. Our law on this subject is clearly established: exigent circumstances involving the physical peril of officers can alter normal Fourth Amendment rules. It is nowhere clearly established that the facts and circumstances of this encounter were insufficient to allow the restraint of this subject if he tried to retreat into his apartment. In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the Court excused an officer's failure to secure a warrant for a house because the suspect's retreat into the house from the doorway created the possibility of the destruction by the suspect of physical evidence. The safety of an officer is surely on a par with concern about physical evidence. See *United States v. Turner*, 926 F.2d 883, 887 (9th Cir.1991); *United States v. Ramirez*, 770 F.2d 1458, 1461 (9th Cir.1985); *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir.1983). Because dangerous people do not differentiate between misdemeanors and felonies, the law should not either. It is a fact that many officers are killed during traffic stops for mere infractions.

But, here's the rub: the facts are disputed, and the disputed facts here should have been submitted to the jury, even when qualified immunity *from suit* was an issue. Issues of credibility belong to the trier of fact. The Seventh Amendment to the Constitution so requires. *Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir.1997) makes this as clear as the proverbial bell. See also *Johnson v. Jones*, 515 U.S. 304, 317–18, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (holding that the existence of genuine issues of material facts render not appealable a pre-trial denial of summary judgment on the issue of qualified immunity).

As for LaLonde's claims of excessive force, I respectfully disagree with the majority's conclusion that the "knee-in-the-back" allegation was sufficient to survive a claim of qualified immunity. There is no doubt from this record, none whatsoever, that LaLonde was resisting arrest when this force was applied. He admits this unlawful behavior. A person being detained or arrested has no right to resist, even if the detention or arrest is without reasonable suspicion or probable cause. A reasonable officer could certainly conclude given these circumstances that the weaponless application of non-lethal and non-dangerous force—such as a knee-in-the-back—was proper under the law. That another view of the reasonableness of this force could also be possible is of no conse-

quence. *Hunter* says that "court[s] should ask whether the agents acted reasonable under settled law in the circumstances, not whether another reasonably, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter,* 502 U.S. at 228, 112 S.Ct. 534. The majority opinion makes the same mistake corrected by the Supreme Court in *Hunter.*

LaLonde's garden variety handcuffing allegation is equally unpersuasive. Handcuffs are uncomfortable and unpleasant, and LaLonde proffers nothing but subjective evidence that their use in this case constituted excessive force. Handcuffing an arrestee is standard practice, everywhere.

Where I do agree with the majority opinion with respect to excessive force is on the allegation of unnecessarily prolonged exposure to pepper spray. Given these facts, the failure of the officers to follow their first aid training could very well amount to the purposeful use of excessive force for which a cause of action would exist. The resolution of this issue was for the jury.

Accordingly, I would affirm the district court on its rulings except for its decision to dismiss the unlawful seizure and arrest claim, and its decision during the trial to take away from the jury the excessive force claim as to the prolonged exposure to pepper spray.