**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LAURA GONZALEZ, individually and on behalf of the statutory beneficiaries of Ramon Timothy Lopez, and in her capacity as the Personal Representative of the estate of Ramon Timothy Lopez, | No. 24-2510 D.C. No. 2:21-cv-01340-MTL-DMF |
| *Plaintiff - Appellee,* | OPINION |
| v. | |
| CITY OF PHOENIX, a municipality; BOBBI COZAD; OSCAR JIMENEZ; BRETT LINGENFELTER; ALONSO LOPEZ; ROSZELL MOSLEY; TODD STEVENS; ANDREW WILLIAMS, | |
| *Defendants - Appellants.* | |

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted May 12, 2025
Phoenix, Arizona

Filed January 8, 2026

Before: Johnnie B. Rawlinson, Patrick J. Bumatay, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez;
Partial Concurrence and Partial Dissent by Judge Bumatay

## SUMMARY[*]

### Excessive Force

The panel affirmed the district court's denial of qualified immunity to Phoenix Police Department officers in a suit alleging that after apprehending decedent Timothy Lopez following a foot chase, the officers used excessive force by applying a RIPP hobble restraint that bent Lopez's body upward into a hogtied position while he lay face down in a police vehicle, during which he became unresponsive, and was later pronounced dead.

The panel first held that the officers' actions of placing and transporting Lopez in a RIPP constituted a seizure for Fourth Amendment purposes. The panel next held that viewing the evidence in the light most favorable to plaintiff, Lopez's mother, a jury could determine that the officers' use of force was unreasonable because the RIPP restraint exerted significant pressure on Lopez's chest, restricting his ability to breathe and unnecessarily creating a substantial risk of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

death or serious bodily injury. Furthermore, the law from this circuit has long established that in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of force or a refusal without cause to alleviate its harmful effects constitutes excessive force. Accordingly, the panel affirmed the district court and remanded for further proceedings.

Concurring in the judgment in part and dissenting in part, Judge Bumatay wrote that though the initial use of the RIPP restraint was reasonable, he agreed with the majority that the officers who left Lopez prone on his stomach while effectively hogtied in the back of the police vehicle were not entitled to qualified immunity. However, he would have granted qualified immunity to Officers Lopez and Cozad because no case clearly establishes that merely *driving a car* a short distance with an improperly restrained suspect violates the Constitution. This action—transporting a suspect—is very different from the actions of officers who actively continued to use what allegedly amounted to deadly force on Lopez.

## COUNSEL

Jesse M. Showalter (argued) and Joel B. Robbins, Robbins Curtin Millea & Showalter LLC, Phoenix, Arizona, for Plaintiff-Appellee.

Ashley E. Caballero-Daltrey (argued) and John T. Masterson, Jones Skelton & Hochuli PLC, Phoenix, Arizona; for Defendants-Appellants.

# OPINION

SANCHEZ, Circuit Judge:

After pursuing and apprehending Ramon Timothy Lopez in a foot chase, officers of the Phoenix Police Department applied a "RIPP" restraint connecting Lopez's ankle restraint to his handcuffed wrists and causing Lopez's body to bend upward in a hogtied position. Lopez grunted and gasped as he lay on his chest and then became limp. He was carried to a patrol vehicle and laid face down across the back seat with the RIPP restraint still in place. After officers drove Lopez to a nearby parking lot, they found him unresponsive. He was transported to a hospital and pronounced dead. Lopez's mother, Plaintiff Laura Gonzalez, sued the City of Phoenix and several of the officers alleging excessive force and related federal and state law claims. Defendants now appeal the district court's partial denial of their motion for summary judgment.

In this interlocutory appeal, we address a narrow question: whether defendants are entitled to qualified immunity from Plaintiff's claim that the officers used excessive force by placing and transporting Lopez in a hogtied and prone position after he no longer posed a risk of flight or a threat to officer safety. Viewing the evidence in the light most favorable to Plaintiff, a jury could determine that the officers' use of force was unreasonable because the RIPP restraint exerted significant pressure on Lopez's chest, restricting his ability to breathe and unnecessarily creating a substantial risk of death or serious bodily injury. Furthermore, law from our circuit has long established that "[i]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a

continued use of force or a refusal without cause to alleviate its harmful effects constitutes excessive force." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (quoting *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000)) (cleaned up). Accordingly, we affirm the district court and remand for further proceedings.

## I.

## A.

On August 4, 2020, the Phoenix Police Department ("Phoenix PD") received a report of a man acting erratically. Phoenix Police Officers Todd Stevens, Andrew Williams, and Roszell Mosley arrived on the scene. They watched Lopez remove a wallet from his pocket, empty its contents, and discard the wallet. Lopez appeared "spooked" and "paranoid" as he bounced from car to car, ran into a wall, and fell down. Based on his behavior, the officers suspected that Lopez was high on methamphetamine.

Officer Stevens approached Lopez by a liquor store entrance, and Lopez ran out of the store. Officer Stevens gave chase and ordered Lopez to stop. Lopez ignored the command and ran onto a busy street with ongoing traffic. Officer Stevens followed Lopez and pulled him down. Officers Williams and Mosley arrived moments later. They grabbed Lopez's arms and wrists as Officer Stevens called for backup and ordered Lopez to roll onto his stomach. Lopez struggled to free himself from the officers' grasp by pulling his arms and kicking his legs up. Pressed to the ground, Lopez appeared distressed, disoriented, and out of breath. He grunted and cried out several times. Officer Mosley observed, "I think his left arm's broken." At the time Lopez was detained, the ambient air temperature in

Phoenix was 101 degrees and the temperature of the asphalt was approximately 145 degrees.

After a minute of struggle, the officers rolled Lopez onto his stomach. They pressed him face down and placed handcuffs on his wrists. Officer Stevens held Lopez's left shoulder or upper arm and lifted it off the ground, Officer Williams held Lopez's ankles, and Officer Mosley pressed his knee to Lopez's back. Lopez told the officers, "You guys are killing me." Lopez continued to cry out and grunt but stopped struggling. The officers held Lopez in a prone position for nearly three minutes. More officers arrived in response to the call for backup. Officers Alonso Lopez, Bobbi Cozad, Oscar Jimenez, and Brett Lingenfelter parked their patrol vehicles to block the street traffic. Officer Jimenez then applied a RIPP restraint on Lopez.

A RIPP restraint is a type of hobble restraint meant to temporarily secure combative or violent subjects to prevent injury to the subject or officers and to minimize the opportunity for escape. A RIPP restraint consists of a nylon loop with a metal fastener or cinch on one end, a long strap extending from the loop, and a brass hook or latch at the end of the strap to connect to a subject's handcuffs. Phoenix PD are trained to apply a RIPP restraint by securing the RIPP restraint around the subject's ankles, extending the strap upward from the ankle restraint, and attaching the hook to the subject's handcuffs. Officers are trained to never shorten the RIPP restraint by looping the strap through the subject's handcuffs and fastening the hook to the subject's ankle restraint. Doing so lifts the suspect's legs in the air and upward toward the wrists and impedes the suspect's ability to breathe. Phoenix PD are also trained to leave sufficient length on the RIPP restraint strap so that officers can raise the suspect onto his feet to enable transport.

According to Plaintiff, the officers' application of the RIPP restraint on Lopez deviated from department training and policy and effectively hogtied Lopez. Officer Jimenez shortened the RIPP restraint by looping it through Lopez's handcuffs and attaching the hook to Lopez's ankle strap. In doing so, the shortened RIPP restraint bent Lopez's arms back and lifted his legs up so that his ankles were lifted off the ground and pulled toward his wrists. Once bound, Lopez did not move. Officer Mosley continued to press his knee on Lopez's back for fifty-five seconds. Lopez remained hogtied and face down against the pavement for nearly one minute.

In that position, Lopez's condition appeared to worsen. Officer Cozad later testified that Lopez was grunting, his skin tone appeared abnormal, and he "obviously needed medical attention." Lopez soon stopped making noises, and as multiple officers observed, his body went limp. Officer Williams radioed the Fire Department for medical assistance. Officer Mosley lifted his knee from Lopez's back. By this point, nearly six minutes had elapsed since the officers first held Lopez down on the asphalt. The officers tried to pull Lopez up, as Officer Mosley told him to "sit up" and "relax"—but Lopez did not respond. The officers did not, however, adjust his RIPP restraint.

Officers Mosley, Stevens, and Jimenez lifted Lopez's body by his arms and legs and carried him to a nearby police vehicle. They placed Lopez face down in the back seat, with his chest outstretched and his legs still bent up, secured by the RIPP restraint and handcuffs. A fourth officer, Officer Lingenfelter, moved to the other side of the vehicle and helped pull Lopez across the back seat. Lopez's torso rested atop a hard plastic hump dividing the seats. Officer

Lingenfelter pushed Lopez's shoulders into the vehicle and shut the car door.

Officers Cozad and Lopez drove Lopez to a nearby parking lot. The drive lasted two minutes. Neither officer turned to observe Lopez or check on his condition during the drive. Lopez continued to lay face down in the back seat with his ankles bound to his wrists and his legs lifted upward. Once they reached the parking lot, Officers Cozad and Lopez removed Lopez from the vehicle and discovered that he was unresponsive. They removed the RIPP restraint and sat him up. The officers rested Lopez against the car door, poured water over his head, and rubbed his sternum. But they observed that Lopez's eyes had rolled backward.

Phoenix Fire Department personnel arrived and found that Lopez was not breathing and had no pulse. Paramedics were unable to resuscitate him. Lopez was transported to a hospital, where he was pronounced dead. According to the medical examiner's report, Lopez's death was caused by "[c]ardiac arrest in the setting of methamphetamine intoxication, dilated cardiomyopathy, and physical restraint."

## B.

Plaintiff Laura Gonzalez filed suit individually, on behalf of Lopez's statutory beneficiaries, and in her capacity as the personal representative of Lopez's estate under 42 U.S.C. § 1983 and Arizona law. She named Defendants City of Phoenix and Officers Cozad, Jimenez, Lingenfelter, Lopez, Mosley, Stevens, and Williams in the action. In her complaint, Gonzalez asserted Fourth Amendment claims of false arrest and excessive force, a Fourteenth Amendment claim for deprivation of familial society and companionship, claims against the City of Phoenix under *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978), and state law claims of wrongful death and negligent supervision against the City of Phoenix. Defendants moved for summary judgment on all claims based on qualified immunity.

The district court granted in part and denied in part Defendants' motion for summary judgment. The court granted Defendants' motion with respect to Plaintiff's federal law claims of false arrest, deprivation of familial and societal companionship, and *Monell* liability against the City of Phoenix, as well as Plaintiff's state law claim of negligent training and supervision. The district court also granted Defendants' motion concerning the officers' use of force prior to and including the initial application of the RIPP restraint.[1] The court denied Defendants' motion with respect to the officers' use of force after the application of the RIPP restraint, including Officer Mosley's kneeling on Lopez and the officers' placement and transportation of Lopez in a police vehicle while he was subject to the RIPP restraint. The district court also denied summary judgment as to Plaintiff's related failure to intervene claim, Plaintiff's wrongful death claim based on vicarious liability, and Plaintiff's request for punitive damages against individual defendants.

Defendants timely appealed the district court's denial of qualified immunity in part. The only questions before this Court are whether Defendants are entitled to qualified immunity based upon (1) Officers Mosley, Stevens, Jimenez, and Lingenfelter placing Lopez into a police vehicle in his face-down, handcuffed, and RIPP-restrained

---

[1] Under our interlocutory review, these determinations are not before this Court.

position, and (2) Officers Cozad and Lopez transporting Lopez to a parking lot while Lopez remained in that position.

## II.

We must "decide de novo whether the facts, considered in the light most favorable to the plaintiff, show that qualified immunity is warranted" when we review a district court's denial of summary judgment based on qualified immunity. *Sanderlin v. Dwyer*, 116 F.4th 905, 910 (9th Cir. 2024) (quoting *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023)). Because this is an interlocutory appeal, our jurisdiction is "limited to resolving a defendant's purely legal contention that his or her conduct did not violate the Constitution and, in any event, did not violate clearly established law." *Id.* (quoting *Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) (cleaned up). The scope of our review is "circumscribed." *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (per curiam) (quoting *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013)). "[W]e must consider only 'whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor.'" *Rosenbaum v. City of San Jose*, 107 F. 4th 919, 924 (9th Cir. 2024) (quoting *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012)). We have jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine, *see Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014). We affirm the district court's order.

The qualified immunity doctrine "shields an official from damages in a civil suit unless the plaintiff can make the showing that the official's actions violated a constitutional right, and that the right was 'clearly established' at the time of the violative conduct." *Nelson v. City of Davis*, 685 F.3d

867, 875 (9th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Plaintiff must satisfy both prongs of this test to overcome an officer's qualified immunity defense. *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Because this interlocutory appeal arises from Defendants' motion for summary judgment, we interpret the facts in the light most favorable to Plaintiff and draw all rational inferences in Plaintiff's favor, *see Wall v. Cnty. of Orange*, 364 F.3d 1107, 1109 (9th Cir. 2004), unless Plaintiff's allegations are "blatantly contradicted" by the officers' bodycam video, *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## A.

Defendants contend that their placement and transportation of Lopez in a RIPP restraint did not violate the Fourth Amendment for two reasons. First, they argue that these actions do not fall within the purview of the Fourth Amendment's prohibition against excessive force because the officers did not use "force" when they placed Lopez into a vehicle and transported him. Second, even if such actions constituted force, Defendants maintain that such force was objectively reasonable because of Lopez's "active" resistance, the officers' "express purpose of protecting [Lopez's] safety and getting him medical care," and the absence of "evidence that Lopez was showing clear distress when he was placed in the vehicle."

We begin with Defendants' contention that the officers did not use force when they placed and transported Lopez because the officers never applied additional pressure on Lopez. Defendants' argument misapprehends the nature of the relevant Fourth Amendment inquiry. The text of the

Amendment expressly describes unreasonable "seizures" as the protected right: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.  As the Supreme Court explains, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quotations and citations omitted).

So, the threshold inquiry under the Fourth Amendment is whether the officers intentionally seized Lopez by terminating or restraining his freedom of movement—not whether the officers applied an additional quantum of pressure in seizing him so as to constitute force.  The officers' actions in placing and transporting Lopez in a RIPP restraint are plainly encompassed within the meaning of the Fourth Amendment because such physical restraint terminated Lopez's ability to move freely through means intentionally applied.  Once RIPP-restrained, the record establishes that Lopez did not, and could not, freely move. We conclude that the officers' actions constitute a seizure for Fourth Amendment purposes.[2]

---

[2] Even if Defendants were correct that an additional quantum of force from the officers is required, the record establishes that the officers did place additional pressure on Lopez.  Officers Mosley, Stevens and Jimenez lifted Lopez by his arms and legs and carried him to the patrol vehicle.  Officer Lingenfelter pulled Lopez's body across the seat and pushed Lopez's shoulders inward to shut the car door.  And the officers positioned Lopez atop a hard plastic hump that divided two car seats,

Defendants' second contention—that the use of force or restraint against Lopez was objectively reasonable as a matter of law—is equally unavailing.  Plaintiff has established a genuine dispute of material fact as to whether the officers' use of force violated the Constitution.  An officer's use of force violates the Fourth Amendment if it is objectively unreasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  To make that determination, we balance the "extent of the intrusion on the individual's Fourth Amendment rights against the government's interests." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citations omitted).

That analysis proceeds in three parts.  First, we consider the "severity of the intrusion" on the individual's interests "by evaluating the type and amount of force inflicted." *Id.* (quotations and citations omitted).  Second, we "evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Id.* (citing *Graham*, 490 U.S. at 396–97) (citation omitted).  Third, we "balance the gravity of the intrusion on the individual against the government's need for that intrusion" to determine "whether the force used was greater than is reasonable." *Id.* (quotations and citations omitted).  Because this balancing is "inherently fact specific," we have cautioned that "the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Ctny. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014)

---

which exacerbated the pressure that Lopez's body weight exerted against itself.

(quotations and citations omitted). We conclude that a reasonable jury could determine that the officers' use of a RIPP restraint under the circumstances of this appeal violated the Fourth Amendment.

i.

First, a reasonable jury could conclude that the officers' use of force was significant, if not lethal. We have defined lethal force as force "that creates a substantial risk of death or serious bodily injury." *Bryan v. MacPherson*, 630 F.3d 805, 825 n.6 (9th Cir. 2010) (citing *Smith v. City of Hemet*, 394 F.3d 689, 705–07 (9th Cir. 2005) (en banc)).

Plaintiff's evidence shows that restraining a subject in a hogtied position raises that subject's risk of death through positional asphyxia. Positional asphyxia occurs when an individual's body position restricts their ability to breathe, causing a lack of oxygen. According to Plaintiff's cardiologist expert, Dr. Daniel Wohlgelernter, positional asphyxia "is a well-known trigger of PEA [pulseless electrical activity] and cardiac arrest." Plaintiff's police expert Scott DeFoe explained that "[p]roperly trained officers learn how improper restraining techniques" can lead to this "life-threatening condition."

Hogtying is one such improper form of restraint that can cause positional asphyxia. Phoenix PD training materials warn that "[h]og-tying is almost always listed as a contributing factor [of sudden custody deaths] due to the positional restraint position's ability to aid in inducing positional asphyxia." That is because "[i]f [a] suspect is placed in a hog-tied position, the neural center may not be capable [of] fulfill[ing] oxygen demands." For that reason, the department training materials instruct officers: "**Never** hog-tie anyone," and "DO NOT SHORTEN THE STRAP

OR WRAP AROUND THE SUSPECT'S ANKLES" because doing so bends the subject into a hogtied position. Indeed, as Officer Jimenez acknowledged at his deposition, officers are "trained that you should not feed the RIPP restraint all the way through [the handcuffs] and then attach the hook to the ankles." Instead, Officer Jimenez testified, "what we're trained to do" is to attach the RIPP restraint's brass hook "close to the handcuffs."

Positioning a subject face down—even when properly restrained—also increases their risk of positional asphyxia. Face-down positioning can, according to DeFoe, cause a subject's breathing to become labored. Accordingly, Phoenix PD training materials warn officers to "NEVER ALLOW [a RIPP-restrained subject] TO REMAIN ON THEIR CHEST OR STOMACH," and directs officers to "immediately" roll the subject into an upright seated position. Phoenix PD operations orders likewise require officers to "minimize the face-down exposure," and, when transporting RIPP-restrained subjects, require officers to continually observe the subject and "pull [the vehicle] over" to "move" them to an upright position if they fall down.

Other factors can exacerbate the risk of positional asphyxia. Phoenix PD officers are taught that drug intoxication heightens the likelihood of sudden custody death. Drug intoxication is a "major risk factor" because, as DeFoe explained, "respiratory drive is reduced" and "subjects may not realize they are suffocating." Dr. Wohlgelernter similarly noted that methamphetamine draws from the body's oxygen supply, and creates a "state of agitation," that increases the body's oxygen demand.

Physical struggle, especially in hot conditions, also increases the subject's risk of death. Like drug intoxication,

physical exertion draws on the body's oxygen reserves. And, in hot conditions, significant physical exertion "can generate heat beyond the ability to cool," which, according to Dr. Wohlgelernter, may cause a "loss of enzymatic control [that] affects the functioning of major organs . . . such as the heart and brain." Consequently, exerted individuals "may be more vulnerable to subsequent respiratory muscle failure."

All of these factors together create a high risk of sudden death. Dr. Wohlgelernter explained that as drug intoxication and physical exertion drain the body's oxygen reserves and heighten the body's oxygen demands, "restraint in the prone position" prevents the body from "increas[ing] [its] ventilatory capacity to compensate for [these] increased metabolic demands," and this, in turn, results in "continued carbon dioxide accumulation and development of lethal metabolic acidosis." Or, as the officers' training materials put more bluntly: "Drugs and/or alcohol plus wrestling and/or arrest plus Hog-tie/restraint = Probable fatality = LAW SUIT [sic]."

A reasonable jury thus could find that the officers' use of physical restraints against Lopez created a substantial risk of death or serious bodily injury. The officers placed and transported Lopez face down atop a hard plastic hump with Lopez's RIPP restraint hook attached to Lopez's ankles, which bent Lopez's arms back and lifted his legs upward into a hogtied position. Officer Jimenez admitted that, when he "affixed the brass RIPP restraint [hook] to Ramon's ankles," he "departed from [his own] training." "These actions," according to Dr. Wohlgelernter, "carried a high risk of restricting, to a critical degree, [Lopez's] ability to breathe."

The officers did so when, according to Plaintiff, they knew or should have known that Lopez faced a heightened risk of death from other risk factors.  Lopez had exerted himself by running, struggled under the officers' body weight against the hot asphalt, and, as the officers believed, was under the influence of drugs.  Indeed, Plaintiff's forensic pathologist concluded that "but for the prone restraint and prone positioning while Mr. Lopez was handcuffed and RIPP restrained, there is no evidence to support the conclusion that Ramon Timothy Lopez would have died when he did."  Dr. Wohlgelernter agreed that "the restraint applied to Timothy [Lopez] while he was prone and handcuffed, in combination with the other draws on his oxygen reserves (agitation, exertion, methamphetamine intoxication, hyperthermia, and pain/discomfort from forcible restraint), served as a highly probable trigger for the cardiopulmonary arrest that resulted in his death."

The record also establishes that the officers could see Lopez's risk of positional asphyxia manifest.  True, a reasonable officer cannot be expected to foresee every outcome of his actions; reasonableness "must be judged from the perspective of a reasonable officer on the scene" and not from one with "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Still, a jury could determine that a reasonable officer on the scene would have noticed that the risks of Lopez's positional asphyxia had already begun to materialize by the time the officers lifted him into the patrol vehicle.  Lopez grunted and gasped before falling silent, his skin turned an abnormal tone, and as multiple officers acknowledged, his body became limp.  Lopez "obviously needed medical attention," as Officer Cozad later admitted.

In short, Plaintiff has presented sufficient evidence establishing that the officers' use of force or restraint against

Lopez was significant, if not lethal, and that the intrusion on Lopez's individual interests was therefore severe.

ii.

Second, a reasonable jury could determine that the government's interest in placing Lopez in the vehicle and transporting him in a hogtied and prone position was minimal. To assess the government's interest, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The crime at issue was not severe. The officers responded to a 911 call reporting that a man was behaving oddly, not violently. Lopez committed civil traffic violations when he crossed the street without using a crosswalk and ran into traffic. *See* Ariz. Rev. Stat. §§ 28-793, 28-121(B).

A reasonable jury could determine that, by the time the officers placed and transported a RIPP-restrained Lopez in the police vehicle, Lopez no longer resisted and posed no threat to the officers. At the time Officers Mosley, Stevens, Jimenez, and Lingenfelter lifted Lopez and carried him to the vehicle, they had observed that Lopez was fully bound, unarmed, and helpless. When Officers Cozad and Lopez transported Lopez, he remained face down, handcuffed, and RIPP-restrained in the back seat of the police vehicle. As the district court concluded, even if Lopez once resisted the officers' attempts to subdue him, the body camera video

footage "reflects that Lopez was no longer resisting after he was RIPP restrained."**[3]**

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the government's interest in placing and transporting Lopez in a hogtied and prone position after his surrender was minimal. *See Bryan*, 630 F.3d at 828–29 ("[T]he commission of a misdemeanor offense . . . militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." (quotations and citations omitted)).

iii.

Third, a reasonable jury could conclude that the force used by the officers was greater than is reasonable under the circumstances. Defendants contend that the officers' force was justified because they needed to get Lopez to safety, out of the sun, and away from the busy street, but had limited options because of Lopez's continuing resistance. That resistance, Defendants argue, occurred when Lopez "kicked Officer Mosley while the Officers were placing him into the vehicle and did not cooperate." We reject this argument for two reasons.

---

[3] The district court determined that the officers' initial detention of Lopez was objectively reasonable because Lopez intentionally threw an iced tea beverage at Officer Stevens while running away, constituting an assault under Arizona law, and because Lopez ignored Officer Stevens's command to stop running. The court also determined that the officers' initial application of a RIPP restraint was objectively reasonable because Lopez struggled against the officers' attempts to restrain him, failed to roll over when commanded, and exhibited "extraordinary strength." Plaintiff reserves her right to appeal those determinations following a final judgment in the matter.

First, we do not agree that the officers' subjective motivations to "get Lopez to safety" justified their decision to place and transport Lopez in a hogtied and face-down position. The Supreme Court has cautioned that an "officer's good intentions" will not "make an objectively unreasonable use of force constitutional." *See Graham*, 490 U.S. at 397. Similarly, "a simple statement by an officer that he fears for . . . the safety of others" or the "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (2001).

Second, Defendants overlook that in this interlocutory posture, "[a]ny decision by the district court that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal." *George*, 736 F.3d at 834 (quotations and citation omitted). The district court determined that a genuine dispute of material fact exists as to whether Lopez resisted the officers or tried to kick Officer Mosley as he was carried into the police vehicle. That dispute is not resolvable in this appeal. Even if it were, the video evidence shows no "continuing resistance" by Lopez after he was RIPP-restrained.

Plaintiff has established a genuine dispute of material fact as to whether the officers' application of near-lethal force and the government's minimal interest in using that force was reasonable under the circumstances. As the district court underscored, "there were other, less dangerous, ways of transporting Lopez that were readily available to the Officers." The officers' own police department training materials and operational orders offer a few: the officers could have, for example, modified Lopez's RIPP restraint to its intended position by attaching the restraint's hook to

Lopez's handcuffs instead of his ankle strap; or, the officers could have positioned Lopez upright in the back seat of the vehicle. They could have, as the district court observed, "simply carr[ied] him to one of the many businesses surrounding the road" to get him out of the sun and away from traffic. Defendants do not offer a compelling justification for their decision to instead place and transport Lopez in a hogtied and face-down position when Lopez showed signs of medical distress.

Under *Graham*, a reasonable jury could determine that the officers violated Lopez's constitutional rights by placing and transporting him in a hogtied and prone position after he had surrendered and no longer posed a danger to the officers or a risk of flight.

B.

Under the second prong of the qualified immunity analysis, we examine whether the officers' constitutional violation was clearly established. Police officers are entitled to qualified immunity unless they "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. While the clearly established requisite does not require "a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quotations and citation omitted). Indeed, "even in novel factual circumstances," the Supreme Court has recognized, "[o]fficials can still be on notice that their conduct violates established law." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). *See also Drummond*, 343 F.3d at 1060–61 ("[I]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent

in light of existing law.").  The "salient question" is "whether the state of the law [at the time of the alleged misconduct] gave respondents fair warning that their alleged treatment of [the subject] was unconstitutional."  *Hope*, 536 U.S. at 741. We hold that existing precedent gave the officers fair warning that their decision to place and transport Lopez in a prone and RIPP-restrained position after his surrender, subjecting him to a significant risk of death or serious bodily injury from positional asphyxia, was unconstitutional.

It is a well-worn principle in our law that when "there is no need for force, *any* force used is constitutionally unreasonable."  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) (citations omitted); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("[F]orce is only justified when there is a need for force"); *Green*, 751 F.3d at 1049 ("Where [government] interests do not support a need for force, any force used is constitutionally unreasonable." (quotations and citation omitted)).

This principle carries added significance when the force applied by officers is lethal.  *See Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) (stating that officers may not "kill suspects who do not pose an immediate threat to their safety or to the safety of others.").  Indeed, force that "create[s] a substantial risk of serious injury or death," we have explained, "generally can't be used on a prone suspect who exhibits no resistance, carries no weapon, is surrounded by sufficient officers to restrain him and is not suspected of a violent crime."  *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1131–32 (9th Cir. 2017).

We have applied this principle to hold that an officers' continued pressure against a prone, handcuffed, hobble-restrained subject was excessive.  In *Drummond*, we

concluded that officers used excessive force against an unarmed, mentally ill man when they placed him face down with his wrists handcuffed behind his back, tied a hobble restraint around his ankles, and continued to press their body weight against his upper body, even as he told the officers that he could not breathe—all of which caused compression asphyxia that left the arrestee in a vegetative state. 343 F.3d at 1054–55.

In *Drummond*, we held that "[i]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of force or a refusal without cause to alleviate its harmful effects constitutes excessive force." *Id.* at 1062 (quoting *LaLonde*, 204 F.3d at 961) (cleaned up). We reasoned that, because the arrestee's "hands were cuffed behind his back and he was offering no resistance," "*[a]ny* reasonable officer should have known" that the officers' "continuing" pressure on the arrestee's neck and torso despite his "repeated cries for air" constituted excessive force. *Id.* at 1061.

*Drummond* clearly established that Defendants' actions here violated the Fourth Amendment. As in *Drummond*, Lopez was rendered helpless when he lay prone with his wrists handcuffed behind his back and a hobble restraint around his ankles, though here the two restraints hooked together to bind Lopez even more tightly. And, the officers continued to use force and refused without cause to alleviate its harmful effects. Officers Mosley, Stevens, Jimenez, and Lingenfelter placed Lopez in a face-down, hogtied position without modifying his restraints or repositioning him. And once Officers Cozad and Lopez took custody of Lopez, they did not modify his restraints or reposition him during the transport. The harmful effects of that force were readily observable to all the officers present. The officers noticed

that Lopez, who had once gasped and grunted, had gone silent, multiple officers described Lopez's body as limp, and as Officer Cozad later admitted, Lopez "obviously needed medical attention."

Although the officers in *Drummond* pressed their body weight on an arrestee by kneeling on the arrestee's upper body, the state of the law nevertheless gave Defendants a clear warning that their conduct was unconstitutional. *Id*. at 1063. Here, the officers' decision to maintain Lopez in an improperly-restrained position created similar pressure on his upper body. Placing Lopez's body in a hogtied and prone position across a hard plastic hump caused Lopez's own body weight to exert significant force upon his chest, inducing positional asphyxia. In both cases, the officers continued to exert pressure—whether from kneeling or maintaining tightly-connected restraints—on a prone and helpless subject bound by handcuffs and hobble restraints.

Other precedent supports our analysis. We have repeatedly held that force can be unreasonable when undue pressure caused by physical restraints is not alleviated. *See Wall*, 364 F.3d at 1112 (officers used excessive force "in making the arrest *and continuing* the restraint by handcuffs that hurt and damaged [arrestee's] wrist." (emphasis added)); *LaLonde*, 204 F.3d at 960 (allegations that officers "tightly handcuffed [arrestee] *and refused to loosen* the cuffs when he complained" raised a factual dispute on plaintiff's excessive force claim (emphasis added)); *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003) ("[T]o place *and keep* [arrestee] in handcuffs that were so tight that they caused her unnecessary pain violated her Fourth Amendment right to be free from an unreasonable seizure." (emphasis added)); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (officers used excessive force because defendant "has

presented no evidence that would justify handcuffing [arrestee] so tightly that he suffered pain and bruises, or to justify his *refusal to loosen* the handcuffs after [arrestee] complained" (emphasis added)).

Defendants' efforts to avoid these precedents are unpersuasive. Defendants say that, unlike the injurious restraint cases, Lopez did not ask the officers to remove his RIPP restraints and handcuffs—yet the evidence establishes that the officers could see that Lopez was in medical distress. We likewise reject Defendants' contention that "[a] case regarding overly tight handcuffing cannot clearly establish whether it would violate Lopez's constitutional rights to place him in a vehicle in a prone position with a RIPP restraint for a one-minute ride across the street." Our caselaw on the constitutional limits of less intrusive restraints, like handcuffing, may still provide notice to officers employing far more intrusive restraints, like RIPP restraints, when their unreasonable application can result in death rather than just a painful encounter. *See Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). In any event, our precedent on physical restraints merely reinforces the fair warning that flows from *Drummond*'s holding: an officer's continued application of force—whether from an officer's body or the physical restraints that press the subject's body upon itself—against a prone subject who appears distressed and has been rendered helpless, is unconstitutional.

Tellingly, the officers here were actually warned that their actions unreasonably endangered Lopez. We have explained that training materials may be "relevant" as to "whether reasonable officers would have been on *notice* that the force employed was objectively unreasonable."

*Drummond*, 343 F.3d at 1062. As in *Drummond*, "the officers received training from their *own police department* explaining specifically that . . . asphyxia can result . . . [in] causing death." *Id.* at 1061–62. Defendants violated their own training, which instructed them to "**never** hogtie anyone," and ordered them to roll any RIPP-restrained individual into a seated position instead of leaving them face down. Officer Jimenez admitted that he "departed from [his own] training." Even if the officers' own training did not expressly prohibit the officers' actions, our precedent made clear to them that the Constitution did.

We reject Defendants' contention that the district court improperly conflated its analyses of the force used by the officers who placed Lopez in the police vehicle with the officers who transported Lopez. The district court analyzed the objective reasonableness of the discrete acts committed by both sets of officers and applied caselaw clearly establishing that those actions violated the Fourth Amendment. The district court's approach was proper because we have routinely examined the circumstances in which restraints were applied and maintained alongside the failure to alleviate the harmful effects of those restraints. *See, e.g., LaLonde*, 204 F.3d at 960; *Wall*, 364 F.3d at 1112; *Meredith*, 342 F.3d at 1063.

Our dissenting colleague commits a similar analytical error. While our colleague agrees that qualified immunity should be denied for the officers involved in placing Lopez in the police vehicle face down in a RIPP-restrained and hogtied position, he concludes that the two officers who transported Lopez a short distance away should be entitled to qualified immunity. Our colleague reasons that "no case clearly establishes that merely *driving a car* a short distance with an improperly restrained suspect violates the

Constitution." But the actions of Officer Lopez and Officer Cozad cannot be segmented away so neatly. Rather, use of force analysis requires consideration of the "totality of the circumstances." *Graham*, 490 U.S. at 396.

The totality of the circumstances shows that, like the officers who placed Lopez into the police vehicle, Officer Cozad and Officer Lopez refused to alleviate the harmful effects of unreasonable force on a helpless subject—here, the force of an improperly-applied RIPP restraint that exerted significant pressure on Lopez's chest and unnecessarily created a substantial risk of death. Like the other officers, Officer Cozad and Officer Lopez were present when Lopez was lifted into their police vehicle in a RIPP-restrained position and moved face down over a plastic hump in the back seat of the car. Like the other officers, Officer Cozad and Officer Lopez could see that Lopez was helpless, limp, and in medical distress. And, like the other officers, Officer Cozad and Officer Lopez were trained never to shorten the RIPP restraint straps or to leave a subject lying face down in a RIPP-restrained position. Instead, Officer Cozad and Officer Lopez were trained, when transporting a RIPP-restrained subject, to continually observe them and immediately pull the vehicle over if the subject falls from an upright position. Yet the evidence at this stage shows that neither officer modified Lopez's positioning or sat him upright.

As the Supreme Court observes, our clearly established law analysis must proceed based on Plaintiff's allegations rather than Defendants' framing of the evidence. The Supreme Court has emphasized "the importance of drawing inferences in favor of the nonmovant" when deciding "the clearly-established prong" of the qualified immunity analysis. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Courts

must "define the 'clearly established' right at issue on the basis of the 'specific context of the case[,]'" and therefore, "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* (citations omitted).

So, here, the qualified immunity analysis does not boil down to a case about "driving a suspect" a short distance away, as Defendants and our dissenting colleague frame the issue.    Rather, we define the context of our clearly established law inquiry based on Plaintiff's allegations and evidence, which establish that Officer Cozad and Officer Lopez took custody of Lopez and assumed full responsibility for his safety, and that Officer Cozad and Officer Lopez transported Lopez in a face-down, hogtied position without modifying his restraints or repositioning him.  The officers' continued application of force and failure to alleviate the harmful effects of the RIPP restraint against a prone subject who was in medical distress and had been rendered helpless, is unconstitutional. *Drummond*, 343 F.3d at 1062.

***

Under the circumstances of this interlocutory appeal, any reasonable officer would have known that the officers' actions violated Lopez's clearly established constitutional rights.  We conclude that the district court properly denied Defendants qualified immunity for Officers Mosley, Stevens, Jimenez, and Lingenfelter's placement of Lopez into the vehicle in a hogtied and prone position, and Officers Cozad and Lopez's transportation of Lopez under the same restrained conditions.

**AFFIRMED; REMANDED for further proceedings.**

BUMATAY, Circuit Judge, concurring in the judgment in part and dissenting in part:

No doubt, this case presents tragic facts. Three Phoenix police officers responded to a 911 call about a man acting erratically. When they arrived on the scene, they found Ramon Timothy Lopez—paranoid and spooked. At some point, Lopez took off running. After a chase and a struggle, the officers tackled him in the middle of a road. But Lopez still didn't comply. After more officers showed up, they were finally able to subdue Lopez. They used what's called a "RIPP restraint"—a device that loops a person's ankles to his handcuffs. The result is something close to hogtying the person. While effective in stopping a resisting suspect, it is widely known to be dangerous. If a person is left prone on his stomach while in a RIPP restraint, he may asphyxiate and die.

That's what one side says happened. After officers placed Lopez in the RIPP restraint, they carried him to the backseat of a police Tahoe. There, they placed him face-down over a hard plastic console with his hands cuffed and his legs curled up. The officers didn't sit him up as required to prevent asphyxiation. Minutes later, Lopez was found unresponsive. Officers did their best to revive him, and the fire department quickly gave him medical attention. Unfortunately, their efforts failed, and Lopez was pronounced dead at a local hospital. His cause of death: "[c]ardiac arrest in the setting of methamphetamine intoxication, dilated cardiomyopathy and physical restraint."

Though the initial use of the RIPP restraint was reasonable, I agree with the majority that the officers who left Lopez prone on his stomach while effectively hogtied in the back of the Tahoe are not entitled to qualified immunity.

Simply, leaving a subdued, non-dangerous suspect in a position with a high risk of asphyxiation would violate clearly established law. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (observing that "kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law").

Two other officers, however, had a different role in the events. Officers Alonso Lopez and Bobbi Cozad didn't subdue Lopez, place the RIPP restraint on him, or carry him into the Tahoe. They didn't leave Lopez prone on his stomach in the backseat. While other officers handled Lopez, all Officers Lopez and Cozad did was drive the Tahoe to a nearby Walgreens' parking lot—which took no more than two minutes. In fact, they didn't interact with Lopez until they found him unconscious and administered first aid.

I would have granted qualified immunity to Officers Lopez and Cozad. No case clearly establishes that merely *driving a car* a short distance with an improperly restrained suspect violates the Constitution. This action—transporting a suspect—is very different from the actions of officers who actively continued to use what allegedly amounted to deadly force on Lopez.

I respectfully dissent from the denial of qualified immunity for Officers Lopez and Cozad.

## I.

We do not deny qualified immunity in gross. Qualified immunity analysis must be "conducted separately for each search or seizure that is alleged to be unconstitutional."

*Cnty. of Los Angeles, Cal. v. Mendez*, 581 U.S. 420, 428 (2017).  And liability "may not be imposed based on a 'team effort theory that would . . . lump all the defendants together." *Peck v. Montoya*, 51 F.4th 877, 890 (9th Cir. 2022) (simplified).  That's because "[l]iability requires at least enough individual involvement from each defendant to put him on notice that his conduct might reasonably lead to a constitutional violation." *Id.* at 891.  So qualified immunity analysis demands that "each individual's liability" be based "on his own conduct." *Id.* at 890.  Only then can we determine "whether the violative nature of *particular* conduct is clearly established." *Id.* at 891 (simplified).  So the clearly established prong of qualified immunity must be analyzed officer by officer.

The Ninth Circuit has struggled to apply clearly established law properly in the past.  *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (simplified).  For a right to be clearly established, it must be "sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (simplified).

And specificity "is especially important in the Fourth Amendment context" considering how "difficult" it can be "for an officer to determine how . . . excessive force[] will apply to the factual situation [he] confronts." *Id.* at 12 (simplified).  So "[c]ases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Waid v. Cnty. Of Lyon*, 87 F.4th 383, 388 (9th Cir. 2023) (simplified).  Rather, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 584 U.S. at 104.

The actions of the individual officers here were distinct and should have been analyzed differently. No clearly established law shows that the two transporting officers violated Lopez's constitutional rights. They are thus entitled to qualified immunity.

**A.**

Lopez's estate tries to sidestep the "clearly established" inquiry completely by proclaiming the transporting officers' alleged constitutional violation was "obvious." But that's wrong. The "obviousness principle" serves as "an exception to the specific-case requirement" for qualified immunity. *Sharp v. County of Orange*, 871 F.3d 901, 912 (9th Cir. 2017). But it's an exceedingly high bar to meet. We require Fourth Amendment violations to be "beyond debate" to be considered obvious. *Waid*, 87 F.4th at 388 (simplified). That's because obviousness is "especially problematic in the Fourth-Amendment context," which poses so many factually distinct situations that "a categorical statement that conduct obviously violates the Fourth Amendment 'is particularly hard to make[.]'" *Id.* (simplified). So barring "exceedingly rare circumstances with extreme facts," *id.* at 389, obviousness can't be used to dispense with the "clearly established law" prong.

We've recently recounted the cases showing the "extreme facts" needed to establish obviousness:

- Seizing persons for over five hours because they witnessed a crime with no justification;

- Arresting a sixth-grade student even though the child was compliant,

committed no wrongdoing, and posed no threat to anyone; and

- Shooting and killing a suspect holding a baseball bat even though he was not facing the officer and was not threatening anyone.

*Id.* at 389 (simplified).

Here, Officers Lopez and Cozad didn't participate in subduing Lopez, they didn't take part in shackling him with the RIPP restraint, and they didn't place him in the backseat of the Tahoe. All they did was transport Lopez a short distance after other officers took control of him. While they might have been negligent in not checking on Lopez, they didn't actively harm him. Briefly transporting a suspect improperly restrained by other officers is not the rare case excusing the "specific-case requirement" for qualified immunity. *Sharp*, 871 F.3d at 912.

## B.

With obviousness dispensed with, Lopez's estate must point to a case showing that driving a vehicle with an improperly restrained suspect clearly violates a constitutional right. Instead, all we get are cases standing for the broadest proposition that "a continued use of [force] or a refusal without cause to alleviate its harmful effects constitutes excessive force." *Drummond*, 343 F.3d at 1062; *see also Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993).

None of these cases comes close to putting Officers Lopez and Cozad on notice that their actions clearly violated the Fourth Amendment. In *Drummond*, officers allegedly crushed the plaintiff with their body weight to the point of suffocating him—even though he wasn't resisting and he told officers they were choking him. 343 F.3d at 1061–62. In *Wall*, the officers cuffed a plaintiff so brutally the cuffs "hurt and damaged [his] wrist"—refusing to loosen them after he begged the officers for help several times. 364 F.3d at 1110, 1112. Similarly, in *LaLonde*, officers left a plaintiff tightly handcuffed with pepper spray burning his face for over 20 minutes even after he stopped resisting. 204 F.3d at 951–52. In *Meredith*, the officer grabbed a plaintiff by her arms, threw her to the ground, and twisted her arms to cuff her—later not loosening the cuffs for thirty minutes, even after she complained of their tightness several times. 342 F.3d at 1060. And *Palmer* involved an "abusive application of handcuffs" following a seizure that left Palmer with "pain and bruises." 9 F.3d at 1436. In all these cases, officers placed the plaintiffs in restraints and then refused to loosen them after the plaintiffs complained.

These cases are qualitatively different than driving a suspect subdued and restrained by other officers a short distance. Transportation doesn't involve the same active participation in restraining as in *Drummond*, *Wall*, *LaLonde*, *Meredith*, and *Palmer*. Rather, driving Lopez while he lay prone in the backseat gave the officers only a brief and indirect connection to restraining Lopez. And Officers Lopez and Cozad never refused to alleviate restraints as in

those cases. [1]  So they didn't actively and continuously participate in restraining Lopez.  Without excusing Officers Lopez and Cozad's failure to ensure that Lopez was properly transported, these cases do not show a violation of clearly established law.  Applying these cases here would set clearly established law at too high a level of generality.

The majority's choice to conflate the actions of Officers Lopez and Cozad with the other officers' is wrong on both the law and the facts.

First, the facts.  It's uncontested that Officers Lopez and Cozad didn't apply the RIPP restraint or place Lopez in the car face-down.  In fact, they didn't touch him at all until they took him out of the car, at which point they did everything they could to help him.  They also never spoke to him during the entire interaction.  Thus, it's misleading to suggest they affirmatively ignored Lopez's pleas and refused to alleviate the restraints—other officers were responsible for him at all times except for the short two-minute drive.  The totality of the circumstances shows that they were backup or secondary officers to the actions of other officers.  So there's nothing in Officers Lopez and Cozad's actions that violated Lopez's rights.  Instead, the majority tries to pin a constitutional violation on them for merely being in the vicinity of the other officers' actions.

Second, the law.  None of the cases cited by the majority involved two sets of officers—one set of restraining officers and another set of transporting officers.  Neither do these cases ascribe liability simply for being *near* an alleged

---

[1] Of course, this is not to fault Lopez, who potentially couldn't speak up for himself at this point.  This is only to point out that Officers Lopez and Cozad didn't ignore pleas for help as in the other cases.

constitutional violation committed by other officers. Instead, the line of cases the majority relies on uniformly involves an officer's *actions* in "making the arrest and *continuing* the restraint." *Wall*, 364 F.3d at 1112 (emphasis added). None show that the *mere presence* of nearby officers also constitutes a violation. The majority needed to find case law specific to Officers Lopez and Cozad's conduct. It hasn't.

To the extent the majority claims that we must accept a plaintiff's framing of the qualified immunity question, that's incorrect. While it's true that we must "draw[] inferences in favor of the nonmovant," *Tolan v. Cotton*, 572 U.S. 650, 657 (9th Cir. 2014), that doesn't mean that we must ignore the undisputed facts of the case. It just means that we resolve all *disputed facts* in a plaintiff's favor. Doing so neither commands—nor permits—construing two analytically distinct acts as one single act. So nothing compels us to accept any particular framing of a case. And no framing of the facts can get around that no clearly established law shows that Officers Lopez and Cozad committed a constitutional violation.

## II.

The facts here are gut-wrenching. But our justice system requires—and the Supreme Court has repeatedly instructed—that we analyze separate acts distinctly and not set clearly established law at too high a level of generality when we conduct the qualified immunity analysis. I respectfully dissent.